RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962-1981
(973) 538-0800
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BANK OF AMERICA, N.A., successor in interest to MERRILL LYNCH CREDIT CORPORATION, by and through its servicer and attorney-in-fact, PHH MORTGAGE CORPORATION,<br><br>        Plaintiff,<br><br>   v.<br><br>KIRBY WESTHEIMER and JOHN DOE #1 through JOHN DOE #40, inclusive,<br><br>        Defendants. | Civil Action No.<br><br><br><br><br><br><br><br>**VERIFIED COMPLAINT** |

Plaintiff, Bank of America, N.A., successor in interest to Merrill Lynch Credit Corporation, by and through its servicer and attorney-in-fact, PHH Mortgage Corporation, alleges:

### PARTIES

1.    Bank of America, N.A. is a national bank chartered in, and therefore domiciled in, North Carolina. PHH Mortgage Corporation ("PHH") is a New Jersey corporation with its principal place of business located at 2001 Bishops Gate Boulevard, Mount Laurel, New Jersey 08054. PHH is the servicer of the mortgage loan that is the subject of this action and is duly authorized to prosecute, manage and oversee this action on behalf of Bank of America, N.A., successor in interest to Merrill Lynch Credit Corporation ("MLCC").

2.      On information and belief, defendant Kirby Westheimer (the "Borrower"), is an individual who is a citizen and domiciliary of New Jersey, having an address of 210 Mercer Street, Princeton, New Jersey 08540.

3.      On information and belief, defendants John Doe #1 through John Doe #40, inclusive, are fictitious names of individuals and/or entities that may have an interest in the real property that is the subject of this action.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the real party in interest, Bank of America, N.A., and defendants.

5.      Venue is proper pursuant to 28 U.S.C. § 1391(a).

## FACTS

6.      On or about September 15, 2008, MLCC and the Borrower entered into a Construction Loan Agreement, whereby, among other things, MLCC agreed to make a construction loan to the Borrower in the aggregate principal amount of $1,500,000.00 (the "Loan").  Under the Construction Loan Agreement, the Borrower was to use the Loan proceeds to finance the construction of certain improvements to certain real property located at 210 Mercer Street, Princeton, New Jersey 08540 (the "Property"), in accordance with certain plans and specifications.  Further, the improvements to the Property were to be completed by March 31, 2010.

7.      A true and correct copy of the Construction Loan Agreement is attached hereto as **Exhibit A**.

8.     On or about September 15, 2008, to evidence his indebtedness to MLCC, the Borrower executed and delivered to MLCC an Adjustable Rate Note (the "Note") in the principal amount of $1,500,000.00.

9.     A true and correct copy of the Note is attached hereto as **Exhibit B**.

10.    To secure the performance of the Construction Loan Agreement and repayment of the Note, the Borrower executed and delivered to MLCC a certain mortgage (the "Mortgage") dated September 15, 2008, which, among other conditions, rights, duties and privileges as fully set forth therein, encumbers the Property.

11.    A true and correct copy of the Mortgage is attached hereto as **Exhibit C**.

12.    The Mortgage was duly recorded with the Mercer County Clerk's Office at Book 10191, Page 0403, Control No. 200810060528, Inst. No. RD 2008 035182.

13.    The Construction Loan Agreement, Note and Mortgage shall be collectively referred to as the "Loan Documents."

14.    The Borrower defaulted on the Loan Documents because, among other reasons, he has failed to complete the improvements to the Property in accordance with the Construction Loan Agreement.

15.    On May 21, 2012, Plaintiff sent the Borrower a letter advising him, among other things, that he failed to comply with the terms of the Loan Documents by failing to complete the construction of the Project, that accordingly, pursuant to the New Jersey Fair Foreclosure Act, N.J.S.A. 2A:50-53, et seq., Plaintiff provided him with a Notice of Intention to Foreclose, and that, if the Borrower failed to cure his defaults by June 18, 2012, Plaintiff may take steps to terminate his ownership of the Property by commencing a foreclosure action.

16.     A true and correct copy of the May 21, 2012 letter is attached hereto as **Exhibit D**.

17.     Despite Plaintiff's demands, the Borrower has failed to cure all of his defaults under the Loan Documents.

18.     As of November 12, 2012, the Borrower owes the total amount of $1,234,024.20 under to the Loan Documents, plus all attorneys' fees and costs incurred in connection with collecting the debt, and interest continues to accrue.

19.     Plaintiff has paid or may be compelled during the pendency of this action to pay local taxes, assessments, water rates, insurance premiums and other charges affecting the Property, and Plaintiff requests that any sums thus paid by it for said purposes (together with interest thereon), should be added to the sum otherwise due and be deemed secured by the Mortgage and be adjudged a valid lien on the Property.

20.     Defendants have, or claim to have, some interest in, or lien upon said Property or some part thereof, which interest or lien, if any, has accrued subsequent to the lien of the Mortgage.

21.     There are no pending proceedings at law or otherwise to collect or enforce said sums secured by the Note and/or the Mortgage, or any parts thereof.

22.     A title search of the public record was received by Plaintiff for purposes of identifying any lienholder or other persons and entities with an interest in the Property at issue and that said title search reviewed by the attorney of record.

23.     **Exhibits A, B, C** and **D** are expressly incorporated and made a part of this Verified Complaint for all purposes with the same force and effect as if they were completely and fully set forth herein whenever reference has been made to each or any of them.

4

## CAUSE OF ACTION FOR FORECLOSURE OF MORTGAGE

24.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs of this Verified Complaint inclusive as if set forth fully herein.

25.    The Mortgage allows Plaintiff to foreclose on the Property in the event of a default under the Loan Documents.

26.    Defaults have occurred under the Loan Documents.

27.    As holder of the Mortgage on the Property, Plaintiff is entitled to possession of the Property.

28.    The Borrower is now in possession of the Property and, at all relevant times herein, has deprived Plaintiff of possession thereof.

29.    Plaintiff requests that in the event this action will proceed to judgment of foreclosure and sale, said premises should be sold subject to the following:

(a) Any state of facts that an inspection of the Property may show;

(b) Any state of facts that an accurate survey of the Property may show;

(c) Covenants, restrictions, easements, and public utility agreements of record;

(d) Building and zoning ordinances of the municipality in which the Property are located and possible violations of same;

(e) Rights, if any, of tenants or persons in possession, if any;

(f) Prior lien(s) of record, if any; and

(g) Prior mortgage liens held by Plaintiff and any advances and arrears thereunder.

30.    In the event that Plaintiff possesses any other lien(s) against the Property either by way of judgment, junior mortgage or otherwise, Plaintiff requests that such other lien(s) shall not be merged in Plaintiff's cause(s) of action set forth in this Verified Complaint, but that

Plaintiff shall be permitted to enforce said other lien(s) and/or seek determination of priority thereof in any independent action(s) or proceeding(s), including without limitation, any surplus money proceedings.

31.     Plaintiff shall not be deemed to have waived, altered, released or changed the election hereinbefore made, by reason of any payment after the commencement of this action, of any or all of the defaults mentioned herein, and such election shall remain effective.

**WHEREFORE**, Plaintiff demands judgment against the defendant(s): (i) fixing the amount of indebtedness due to Plaintiff and secured by the Mortgage held by it on the Property; (ii) barring and foreclosing the Borrower and any and all other defendants from all equity of redemption in and to the Property; (iii) directing the Borrower to repay the amount of indebtedness due, together with interest, late charges, extension charges, advances, attorneys' fees, and cost of suit, as provided in the Mortgage; (iv) directing that the Property be sold according to law to satisfy the amount of indebtedness; including, but not limited to interest, late fees, attorneys' fees, and costs due to Plaintiff; (v) for possession of the Property; (vi) for costs of suit and attorneys' fees; and (vi) for such other and further relief as the Court may deem just and equitable.

Dated: November 14, 2012

RIKER, DANZIG, SCHERER, HYLAND &
PERRETTI, LLP
Attorneys for Plaintiff

By: _____
Anthony J. Sylvester
Jonathan P. Vuotto

## VERIFICATION

STATE OF FLORIDA       )
                        ) ss:
COUNTY OF DUVAL      )

I, William Brian Teague, of full age, being duly sworn according to law, upon my oath do depose and say:

1.      I am a Vice President of PHH Mortgage Corporation, the servicer and attorney-in-fact for Bank of America, N.A., successor in interest to Merrill Lynch Credit Corporation, the plaintiff in this matter.

2.      I have read the foregoing Verified Complaint and declare under penalty of perjury that all of the factual allegations contained herein are true and correct to the best of my knowledge and all documents attached hereto are true and correct copies of said documents.

<div style="margin-left:50%;">

Bank of America, National Association,
successor in interest by merger to
Merrill Lynch Credit Corporation,
by PHH Mortgage Corporation
its attorney in fact

William Brian Teague
Vice President

</div>

Sworn to before me this 14th
Day of November, 2012,
By William Brian Teague who is
personally known to me.

Notary Public

SHANNON M. PARMENTER
Commission # EE 008654
Expires July 16, 2014
Bonded Thru Troy Fain Insurance 800-385-7019

# EXHIBIT A
# TO VERIFIED COMPLAINT

# CONSTRUCTION LOAN AGREEMENT

Loan No. 7102396632                               Date:  September 15, 2008

THIS CONSTRUCTION LOAN AGREEMENT (the "Agreement") is made by and between, Kirby    Westheimer,    ("Owner"), whose address is 210  MERCER  STREET   , PRINCETON, NJ  08540 ,

and

Merrill Lynch Credit Corporation , a  Delaware  Corporation   . ("LENDER"), whose address is  5201 Gate Parkway Jacksonville, FL 32256

Recitals

A.   LENDER is making a construction loan to OWNER in the  aggregate principle amount of   $1,500,000 00 (the "Loan")

B.   The Loan is evidenced by the Owner's promissory note of this date (the "Note").

C.   The Loan is secured by a mortgage of this date from Owner to LENDER and, for Mortgage 100ᴾᴹ  accounts, by a Pledge Agreement for Securities Account and related documents, and for Parent Power ®accounts, further secured by either a Parent Power®Guaranty and Security Agreement for Securities Account and related documents or a Parent Power ℗ Guaranty Agreement for Real Estate and related documents (collectively referred to herein as the "Security Documents").

D.   The Security Document creates a lien in favor of LENDER on the real property and improvements owned by Owner located in MERCER County, New Jersey (the "Property"). The Property is more particularly described on attached Exhibit A.

E.   This Agreement sets forth rights and responsibilities of LENDER and Owner regarding the Loan

NOW, therefore, for good and valuable consideration, Owner and LENDER agree as follows

## ARTICLE 1  DEFINITION OF TERMS

Some terms are defined in the recitals above.  In addition, the following terms shall have the following meanings:

"Construction Contract" is the contract between Owner and the Contractor for the construction of the Improvements.

"Construction Costs" means the estimated cost of the Improvements of $2,567,123.00, as provided in the Construction Contract.

"Construction Cost Deficiency" means an amount which may be established by LENDER at any time during the term of the Loan if LENDER determines that the actual cost to complete construction of the Improvements may or will exceed the sum of the Loan Proceeds and the funds representing the Cost Balance, if any.

"Construction Period" means the period ending  03/31/2010 .

"Contractor" means  Madar Construction .

"Cost Balance" means the negative difference, if any, between the Loan Proceeds and the Construction Costs.

"Disbursement Schedule" means the schedule of disbursements attached as Exhibit B, as the same may be amended from time to time.

"Improvements" means the improvements to be constructed on the Property in accordance with the Plans and Specifications.

"Lien Law" means the mechanics lien law or similar law in force in the State.

"Loan Proceeds" means the net funds available for disbursement as proceeds of the Loan to finance the construction of the Improvements after payment of any applicable closing costs and related expenses.

"Plans and Specifications" means the construction drawings, plans and specifications and addenda for construction of the Improvements, as delivered by Owner to LENDER.

"State" means the State of New Jersey.

ARTICLE 2. CONSTRUCTION LOAN AND DISBURSEMENTS

2.1   Construction Loan.

a.   LENDER makes the Loan to Owner for the purpose of the construction of the Improvements.

b.   Construction of the Improvements will be completed no later than the end of the Construction Period, unless Borrower has requested an extension of the Construction Period, in accordance with the Security Documents, and Lender has approved such extension request. An extension may be evidenced by a Notice from Lender to Borrower, setting forth the new expiration dated of the Construction Period, the new Commencement Date (as that term is defined in the Note) and the interest rate for the extended Construction Period, which interest rate will be established pursuant to the terms of the Note

2.2   Cost Balance and Construction Cost Deficiency

a.   Any Cost Balance will be funded by Owner before the disbursement of any loan proceeds by LENDER.

b.   If required by LENDER, Owner will fund the Cost Balance, and deliver the Cost Balance to LENDER on the closing of the Loan.

c.   Owner represents and warrants to LENDER that the Loan Proceeds and the funds representing the Cost Balance, if any, will be sufficient to pay in full the cost of construction of the Improvements.

d.   At any time during the term of the Loan, LENDER may determine that the actual cost to complete construction of the Improvements may or will exceed the sum of the Loan Proceeds and the funds representing the Cost Balance, if any. In that event, Owner will fund such excess cost prior to any disbursement or further disbursement being made by LENDER. In the alternative, Owner will, upon demand of LENDER, deliver the amount of such excess cost (the "Construction Cost Deficiency") to LENDER

e.   LENDER will hold any Cost Balance and any Construction Cost Deficiency for subsequent disbursement. At LENDER's option, the Cost Balance and/or the Construction Cost Deficiency may be applied in full to the Construction Costs before disbursement of any Loan Proceeds, or may be applied proportionately with the Loan Proceeds to the Construction Costs.

f.   LENDER has no obligation to pay interest to Owner for sums held by LENDER.

g.   Owner releases LENDER from any loss resulting from the handling of the funds held by LENDER if LENDER acts in the usual course of business.

h.   Owner agrees that the holding, application and disbursement of any Cost Balance and any Construction Cost Deficiency will be for the account of Owner. However, it is expressly understood by Owner and LENDER that the holding, application and disbursement of the funds is for the protection of LENDER.

2.3   Disbursement of Funds; Limit on Stored Materials; Retainage; Set-Off.

a   The Loan Proceeds, any Cost Balance, and any Construction Loan Deficiency will be disbursed by LENDER in accordance with the Disbursement Schedule, subject to the terms and conditions of this Agreement, and subject to the provisions of the Lien Law.

b   If LENDER and the Owner have executed a Funding Agreement for Lot Acquisition, disbursements will be made as set forth in the Funding Agreement until such time as a Disbursement Schedule is completed.

c.   Owner and the Contractor have approved the Disbursement Schedule. Upon LENDER's request, Owner will promptly furnish LENDER with an itemized breakdown of the Construction Costs.

d   Unless otherwise set forth in the Disbursement Schedule, Owner will use the Loan Proceeds only for the payment of costs directly associated with the construction of the Improvements.

e.   Nothing in this Agreement shall impose upon LENDER any obligation to see to the proper application of any payments made by Owner.

f.   Disbursements will be made by check made payable to Owner or, LENDER's sole discretion, made payable jointly to Owner and the Contractor and/or subcontractors.

g.   LENDER in its sole discretion may make payments for labor, services or materials due under the Construction Contract, or otherwise, directly to the Contractor, any lienor, or any other person who has furnished or performed the same.

h.   No funds will be disbursed for materials stored on the Property without LENDER's prior written consent. Any materials stored on the Property for which LENDER has disbursed funds will be properly identified and inventoried, protected by adequate security measures to prevent theft, vandalism or damage and properly insured for full replacement value. Owner hereby grants LENDER a security interest in such stored materials and any insurance proceeds resulting from a loss of such stored materials, and will, upon LENDER's request, execute and deliver a financing statement meeting the requirements of the Uniform Commercial Code in the State evidencing LENDER's first lien security interest in such stored materials

i     LENDER may, in its discretion, elect to withhold from each disbursement 10% of the scheduled disbursement amount, as retainage. Such retainage, if withheld from each disbursement, will be disbursed with the final scheduled disbursement, subject to the remaining terms and conditions of this Agreement.

j.     LENDER may, in its discretion, elect to set off any and all sums due or to become due to LENDER from Owner, including but not limited to unpaid interest, inspection fees, and/or appraisal fees from and against any disbursement(s).

**2.4**    **Requests for Disbursement**

a.     LENDER will have no obligation to disburse funds unless.

    1.    Owner has delivered to LENDER a signed request for disbursement in form and content satisfactory to LENDER.

    2.    Payroll and material invoices and/or contracts have been provided by Owner to the satisfaction of LENDER.

    3.    Labor and materials have been delivered to, used upon, and incorporated in the Improvements, in a manner satisfactory to LENDER and in compliance with the Plans and Specifications.

    4    LENDER has conducted such inspections as it may require, and the results of the inspections are satisfactory to LENDER.

    5.    Owner has funded any Cost Balance, or pursuant to demand by LENDER, LENDER has received any required Cost Balance or Construction Cost Deficiency.

    6    Owner is in full compliance with, and is not in default under, this Agreement the Note or the Security Document, and no event has occurred that with the giving of notice and/or the passage of any applicable grace period would constitute a default of Owner under this Agreement, the Note, or the Security Documents.

    7.    LENDER has received such documents and/or information as the title insurance company that is insuring the lien of the Security Document may reasonably require.

    8.    Each request for disbursement is accompanied by such waivers of lien, releases of lien, requisitions for payment for subcontractors, and material men, receipts, and other documents as may be required by LENDER.

    9.    LENDER has received a current notice of title continuation or endorsement to the Title Policy, which notice or endorsement will (i) increase the coverage of the Title Policy to the total amount of the Loan that will be outstanding after the requested advance, (ii) confirm that since the last preceding endorsement received by LENDER there has been no change in the state of the title approved by LENDER and (iii) contain such affirmative assurances as LENDER will require.

    10.    LENDER has received and approved the Foundation Survey (section 3 7b) before any disbursement will be made for construction of structural (as opposed to foundation) Improvements.

    11    Such disbursement will be in accordance with the Lien Law and any applicable laws of the State.

    12.    Such disbursement will be in accordance with any rights of LENDER reserved to it under this Agreement

b.     In addition to the items specified above, and before the first disbursement of funds by LENDER, the Owner will have delivered to LENDER:

    1.    Satisfactory evidence that all permits and/or approvals, including, without limitation, the building permit and zoning and subdivision approvals necessary for the construction of the Improvements have been obtained, are in full force and effect, and will not expire prior to the termination of the Construction Period.

    2.    A letter of the Owner's architect, if any, in the form requested by LENDER.

    3.    Satisfactory evidence that all utility services necessary for the construction and use of the Improvements are or will be available at the proper time to serve the Improvements.

    4.    The Title Policy (section 3.6a).

    5    The Boundary Survey (section 3.7a).

c.     In addition to the items specified above, and before the final disbursement of funds by LENDER, the Owner will have delivered to LENDER.

    1.    A final, as built survey prepared by a licensed surveyor and certified to Lender and title insurer, showing the Improvements (section 3.7c)

    2.    A permanent certificate of occupancy (or its equivalent), if available (section 3.8c.5).

**2.5**    **Inspection Rights and Fees; Correction of Defects**

a.     LENDER or its agents will have the right at all times during the period of construction to enter upon the Property to conduct inspections. LENDER will have the right to inspect all records related to the construction of the Improvements at any reasonable time.

b.  Scheduled Inspections will be required for each disbursement under the Disbursement Schedule

c.  Owner will pay all costs of LENDER inspections conducted pursuant to this section. The estimated cost of each inspection is $125.00. At closing of the Loan, Owner will pay to LENDER the sum of 2,000.00 representing the inspection fees payable for 16 inspections. If more than 16 inspections of work in progress are required, then prior to each such additional inspection Owner will pay to LENDER the applicable fee for such inspection. If Owner fails to make such payment, LENDER may disburse to itself such inspection fee out of the Loan Proceeds, the Cost Balance, if any, or such other funds delivered to LENDER pursuant to the terms of this Agreement.

d.  LENDER is under no obligation to supervise construction of the Improvements. LENDER's inspection of the construction of the Improvements is for the sole purpose of protecting and preserving the security of LENDER. No inspection is to be construed as a representation or endorsement that the construction of the Improvements is in fact in compliance with Plans and Specifications, that the construction will be free of defective material or workmanship, or that the construction is in compliance with limitations or requirements imposed by covenants and restrictions of record or by governmental authority.

e.  LENDER has the right to disapprove defective work and materials and may in its discretion, but it is not obligated to, withhold disbursements until any defects are corrected in a good and workmanlike manner and in compliance with applicable law and this Agreement.

2.6  Bond Requirement. At LENDER's option, the Construction Contract will be covered by payment and performance bonds furnished to and acceptable to LENDER in its sole discretion, in an amount not less than 110% of the Construction Costs.

2.7  Signs. LENDER will have the right, at LENDER's expense, to place and maintain a sign or signs on the Property for the purpose of publicizing LENDER's involvement as construction lender for the Improvements. LENDER's sign will be subject to applicable governmental requirements.

2.8  Costs. Owner will be responsible for all costs, fees, and expenses relating to the Loan and to the construction of the Improvements. These include

a.  LENDER's legal counsel.

b.  Preparation of a title insurance of commitment and issuance of a title insurance policy insuring LENDER's interest in the Security Document.

c.  Surveys of the Property.

d.  Appraisal of the Property.

e.  Architecture and engineering services and inspections.

f.  Any taxes or official fees

g.  Construction Inspection fees.

h.  Recording fees and charges.

ARTICLE 3  CONSTRUCTION OF IMPROVEMENTS

3.1  Plans and Specifications.

a.  No change in the Plans and Specifications will be made without the express written approval of LENDER

b.  Any work shown on the construction drawings for the Improvements but not shown in the Plans and Specifications, or vice versa, is to be executed to the same extent as if such work were particularly specified or set forth in the construction drawings or the Plans and Specifications, as the case may be

c  All Plans and Specifications delivered to LENDER are and remain the property of LENDER

3.2  Construction Standards. Owner certifies that the Improvements will be built and constructed:

a  In a first class and workmanlike manner;

b  In full and strict compliance with the Plans and Specifications;

c.  In full and strict compliance with all limitations, reservations, covenants and restrictions of record affecting the Property or the construction of the Improvements;

d.  In accordance with the provisions of any and all applicable Federal, State, county or municipal building and zoning, land use , environmental, construction and mechanics lien laws, and public safety codes, laws, ordinances, rules and regulations.

3.3     Selection of Contractor.

    a.     Owner is solely responsible for selecting and retaining the Contractor at Owner's sole risk and expense. The Contractor will be a general contractor licensed in the State, and will be subject to LENDER's prior evaluation and acceptance which may be granted or withheld in LENDER's reasonable discretion. LENDER's right of evaluation and acceptance is given for the purpose of preserving and protecting the value of LENDERS's security for the Loan, and is not an endorsement, guarantee or recommendation of the performance of the Contractor, the quality of his work or his financial condition. Owner accepts full responsibility for selection of the Contractor and any subcontractors and all materials, supplies and equipment to be used in the construction of the Improvements.

    b.     LENDER will have no liability or responsibility for completion of the Improvements, or for any loss, cost, damage or expense sustained by Owner as a result of LENDER's acceptance of or failure to accept any particular general contractor, or otherwise.

    c.     Owner will disclose to LENDER on a current and ongoing basis, the names of all persons with whom Owner has contracted or intends to contract for the construction of the Improvements or for the furnishing of labor, materials or services therefor. When required by LENDER, Owner will obtain the consent of LENDER to the engagement of all such persons. LENDER's review and acceptance of any such persons or parties is intended for the protection of LENDER's security, and is not an endorsement of the workmanship or financial condition of any such person or party.

3.4     Assignment of Construction Contract/Subordination of Vendee's Lien.

    a.     The Owner hereby assigns to LENDER all of the Owner's right, title and interest in and to the Construction Contract and all permits, Plans and Specifications

    b.     LENDER does not assume any of the obligations of the Owner under the Construction Contract, all of which are expressly retained by the Owner.

    c.     Upon payment in full of the Note and fulfillment of all obligations to LENDER under the terms of this Agreement, the Note, the Security Documents, and any other documents required to be delivered in connection herewith or therewith, this assignment will automatically become null and void.

    d.     Owner hereby subordinates any equitable lien which may arise under any purchase and sale contract to the lien of the Security Documents.

3.5     Insurance.

    a     Owner will procure and maintain during the entire term of the Loan pre-paid All Risk Property insurance policies (and during the period of any construction on the Property, "Builder's Risk" All Risk policies) covering the Improvements to be constructed on the Property, including replacement cost coverage and inflation adjustment endorsements, comprehensive general liability policies and such other insurance policies as LENDER reasonably may require. All hazard insurance policies will be in an amount not less than the greater of (i) full replacement value of the Improvements, or (ii) the Loan amount. Liability insurance coverage will include single claim limits satisfactory to LENDER.

    b.     All insurance policies will be issued by companies, on forms and with deductibles all of which will be subject to LENDER's approval, and will recite LENDER's interest as mortgagee in standard non-contributory mortgagee clauses (New York standard) effective as of closing of the Loan; will be maintained throughout the term of the Loan without cost to LENDER; and will contain such provisions as LENDER deems necessary or desirable to protect its interest in the security, including without limitation a provision for thirty (30) days' prior written notice to LENDER of cancellation of or any change in the risk or coverage insured.

    c.     Flood insurance naming LENDER as mortgagee is required if the Property is shown to be in a Special Flood Hazard Area (flood zone "A" or "V") by the Foundation Survey. Owner will provide LENDER with current insurance certificates indicating LENDER's interest and the required insurance coverages in effect at all times and as provided above, and will furnish to LENDER, upon LENDER's request, verification that all insurance premiums have been paid on a timely basis.

3.6     Title Insurance.

    a.     At or prior to closing of the Loan, Owner will at Owner's expense deliver to LENDER a current commitment for title insurance, committing to insure LENDER as the holder of a first lien on the Property pursuant to the Security Document, and subject only to such matters as LENDER may approve in its sole discretion (the "Title Policy")

    b.     Prior to disbursement of any Loan Proceeds, Owner will at Owner's expense cause a title insurance policy to be issued to LENDER on the basis of the title commitment as approved by LENDER.

3.7     Surveys. Owner will at Owner's expense deliver to LENDER the following surveys of the Property:

    a.     A current boundary survey (the "Boundary Survey").

b    A foundation survey when the foundation of the Improvements has been substantially completed (the "Foundation Survey").

c.   A final "as-built" survey when the Improvements have been completed (the "Final Survey"). Unless otherwise set forth in the Disbursement Schedule, receipt by LENDER of the Boundary Survey and the Foundation Survey is required prior to disbursement of any Loan Proceeds. Each survey will be certified to LENDER and the title insurer, will meet the minimum technical standards of the State, will include a certificate of whether the Property is located within a Special Flood Hazard Area, and otherwise will be subject to LENDER's approval.

3.8  Commencement and Completion of Construction.

a.   Construction of the Improvements will commence within 15 days following the date of this Agreement, and will proceed continuously and diligently, and in a good and workmanlike manner, so that construction of the Improvements will be completed within the Construction Period, unless extended in writing by LENDER, as set forth in section 2.1b herein.

b.   If Owner and LENDER have executed a Funding Agreement for Lot Acquisition, construction of the Improvements will commence within twelve (12) months from the date of the Funding Agreement.

c.   For purposes of this Agreement and all other documents governing Owner's mortgage loan, the Actual Completion Date is when the following conditions are satisfied.

1.   An inspector approved by LENDER will have certified to LENDER that (a) the physical construction of the Improvements has been completed in strict compliance with the Plans and Specifications and (b) all utilities serving the Property have been connected and are operating.

2.   The Final Survey shows that all Improvements lie entirely within the boundary and setback lines of the Property and do not encroach upon any easements or rights-of-way on the Property and which is otherwise satisfactory to LENDER.

3.   A final certificate of occupancy (or its equivalent) has been issued for the Improvements by the governmental authorities having jurisdiction over the Improvements which confirms that construction of the Improvements have been completed in accordance with all applicable requirements. If a certificate of occupancy is not required by local law, evidence that the Improvements have passed all inspections and received all approvals which are conditions precedent to occupancy of the Improvements must be furnished.

4.   LENDER has received a final lender's policy of title insurance in form and substance satisfactory to LENDER in its sole discretion and Owner agrees to execute any and all documents, instruments, and affidavits to induce title company to issue such policy.

5.   Proof of hazard insurance listing LENDER as loss payee and flood insurance, if applicable.

The "Commencement Date" is the first day of the next calendar month following the later of (i) the Actual Completion Date and (ii) the date of the upon which LENDER has received from Owner fully executed originals of all documents, instruments or affidavits reasonably requested by LENDER in memorializing the agreements of the parties relating to the permanent loan. The Commencement Date is the date Owner's permanent loan interest rate commences.

3.09 Power of Completion.  In the event of death or bankruptcy of the Owner or the Contractor, or general assignment for the benefit of creditors by Owner or the Contractor during the period of construction of the Improvements and before completion thereof, or upon any other occasion that might result in cessation of work, LENDER will have full power to take charge of and complete the construction of the Improvements and make disbursements of the Loan Proceeds and funds representing the Cost Balance or such other funds delivered to LENDER as provided herein, but nothing contained herein shall be construed as imposing upon LENDER the obligation to do so

3.10 Licenses/Permits.  Owner has obtained or will have obtained prior to commencement of construction all licenses, permits and approvals of governmental authorities necessary or convenient for the construction of the Improvements, including without limitation, licenses, permits and approvals relating to building and construction, zoning, land use, environmental, and other regulations relating to the construction, ownership, development, use or occupancy of the Property.

3.11 Reappraisal Provision.  If at any time and for any reason LENDER determines the value of the Property may have declined or be less than LENDER previously anticipated, with three (3) days from LENDER's written notice to Owner, LENDER may order a current appraisal of the Property from an appraiser designated by LENDER and in form and content as required by LENDER. The appraisal shall be at Owner's sole cost and expense. Owner shall cooperate fully with any such appraiser. If the reappraised value of the Property and the Improvements does not at least equal the original appraised value, Owner agrees to deposit with LENDER upon demand cash or other collateral acceptable to LENDER in an equal amount to the decline value. The cash or other collateral shall be pledged to LENDER as additional security for this loan and shall be held in a pledged to LENDER as additional security for this loan and shall be held in a pledged account or other credit arrangement acceptable to LENDER. The pledge of the cash or other collateral shall remain effective until the value of the Property and the Improvements has increased to the original appraised value.

ARTICLE 4. LIEN LAW COMPLIANCE

4.1   Lien Law Compliance. Owner's payment of amounts due under the Construction Contract will be subject to the requirements of the Lien Law. Owner accepts full responsibility for compliance, and will comply with the Lien Law, and relieves LENDER from any and all liability thereunder of any nature whatsoever

4.2   LENDER Notification. Owner will notify LENDER immediately upon the filing of any notice or lien required or permitted under the Lien Law immediately upon Owner's receipt of same.

4.3   LENDER's Right to Disburse. If LENDER has not received notice of any matters described in section 4.2 above at the time of any disbursement under this Agreement, then LENDER may disburse as directed by this Agreement without notice to Owner and without regard to the provisions of the Lien Law, and without responsibility or liability to Owner or the Contractor, or to any subcontractors, laborers, material men on lien claimants.

4.4   Releases of Lien. Prior to each disbursement, Owner will furnish to LENDER releases of lien for all persons who have filed liens or have complied with all statutory prerequisites for filing a lien against the Property under the Lien Law and, upon request, releases and waivers of any right to equitable liens on the Property, the undisbursed Loan funds, and proceeds from any sale of the Property.

4.5   Proof of Payment. Upon completion of construction of the Improvements and contemporaneously with disbursement of the final payment due to the Contractor under the Construction Contract, Owner will furnish to LENDER any documentation required under the Lien Law to evidence that all amounts due to the Contractor and all subcontractors, laborers and material men have been paid to the parties entitled to such payments, and that there are no amounts remaining unpaid for which a lien against the Property could arise under the Lien Law.

4.6   Direct Payments. Nothing in this Article 4 will in any way restrict LENDER's prerogative for protection of its security interest to make payments directly to subcontractors, laborers, material men or lien claimants.

4.7   Priority of Security Documents. Owner acknowledges that the lien of the Security Document is intended to be superior to any lien arising under the Lien Law. If any event will have occurred, including the filing of any notice under the Lien Law, that would cause the lien of the Security Document to become secondary to any lien arising under the Lien Law, LENDER will have the right to cancel this Agreement and Owner will reimburse LENDER for its costs and expenses incurred to date. Owner certifies that there has been no construction activity or other actions taken on or with respect to the Property as of the date hereof for which a lien could attach to the Property pursuant to the Lien Law that would be superior to the lien of the Security Document (except such activity or actions as have been expressly disclosed in writing to LENDER prior to the closing of the Loan). OWNER agrees to execute any and all documents and do any and all further acts necessary to protect the superiority of LENDER's Security Documents as determined by LENDER in its sole discretion

4.8   Transfer of Lien. If a lien is filed against the Property under the Lien Law, Owner will at LENDER's request transfer such lien to bond or other security as provided under the Lien Law within 10 days after such lien filed.

4.9   Contested Lien   LENDER has the right to contest any lien filed or to transfer the lien to other security if Owner fails to do so in a timely manner. The cost of such action will become part of the indebtedness under the Note, and secured by the Security Documents.

ARTICLE 5   REPRESENTATIONS AND WARRANTIES OF OWNER

5.1   Existence. Owner, if a corporation, is duly authorized, validly existing and in good standing under the laws of the state of its incorporation and the laws of the State, and has all necessary corporate power to enter these agreements, Owner, if a partnership, is validly existing and in good standing under the laws of the state of its formation and, if required, is qualified to do business in the State, and the partners executing this Agreement and the Note and Security Documents have lawful authority to bind the partnership In accordance with the terms of this Agreement, the Note and Security Documents and any other document being executed by the partnership for the benefit of the LENDER

5.2   No Default. Owner is not in default and has not breached in any material respect any agreement or instrument to which it is a party or by which it may be bound, and the execution and delivery of this Agreement, the Note and Security Documents, and the consummation of the other transactions contemplated herein do not conflict with or result in (i) a violation of any regulation, order, writ, judgment, injunction or decree of any court or governmental or municipal instrumentality or (ii) the breach of or default under an agreement or instrument to which Owner is a party or by which it may be bound.

5 3   Compliance with Laws. Owner has obtained all necessary governmental approvals, including FHA and VA approvals, if applicable, necessary to commence construction of the Improvements.

5.4   Utilities and Zoning. Sewer or septic tank systems, water and all other necessary utilities are available to serve the Property and the Improvements in sufficient quantity for their intended use, without necessity of obtaining further approvals, authorizations, waivers, consents, exceptions or variances. Utility service necessary for the issuance of a certification of occupancy or completion, or its equivalent, is available to the boundaries of the Property in sufficient capacity to serve the Improvements. The current zoning of the Property permits the construction and intended use of the Improvements and no new or additional governmental approvals or authorizations are, or will be, required.

5 5   Absence of Proceeding and Actions   There are no actions, suits or proceedings pending or, to the knowledge of Owner, threatened against or affecting Owner or the Property, or any guarantors of the Loan.

5.6     Financial Statements. All financial statements of Owner and any guarantors of the Loan submitted to LENDER are true and correct as of the date of this Agreement.

5.7D    Condition of Property. To the best of the Owner's knowledge, the Property does not contain any materials or substances that are prohibited or regulated by Federal, State or local laws, or that are known to pose a hazard to the environment or human health  The Property is not now being used nor, to the best of the Owner's knowledge, has ever been used for any activities directly or indirectly involving the generation, use, treatment, storage or disposal of any hazardous or toxic substance, except as customarily may be necessary or required for the construction of the Improvements.

ARTICLE 6. DEFAULT AND REMEDIES

6.1   Owner will be in default if any of the following occurs:

a.     Owner fails to make any payment due to LENDER under the Note, under this Agreement, or otherwise, when the same is due.

b.     Owner fails to perform any obligation strictly according to the terms of this Agreement.

c.     Owner has made any representation or warranty to LENDER which was untrue in any material respect when it was made.

d.     Owner is in default under the terms of the Note, Security Documents, or any other agreement with LENDER.

e.     Contractor fails to perform under the terms of the Construction Contract

f.     Construction of the Improvements is interrupted or suspended for a period of more than 10 days

6.2     In the event of any default, LENDER may, as its option, give Owner 10 days written notice to correct such default. Upon failure of owner to correct such defaults within the 10 day period and such reasonable extensions thereof as may be granted by LENDER, LENDER may exercise the remedies set forth below.

6.3     If Owner is is default under this Agreement, LENDER has the following remedies:

a.     LENDER may withhold further disbursement of the Loan Proceeds and such other funds as have been delivered to LENDER pursuant to this Agreement.

b.     LENDER may credit all funds of Owner then in LENDER's control against the indebtedness due to LENDER under the Note.

c.     LENDER may declare the obligation evidenced by the Note, plus all other amounts payable to LENDER by Owner, to be immediately due and payable in full.

d.     LENDER may exercise its remedies under the Note and Security Documents.

e.     LENDER may assume full charge of the construction of the Improvements and proceed to enter into a contract with the Contractor or a third party contractor for the completion of the Improvements.

LENDER shall have any other remedy or right allowed by law. The remedies and rights of the LENDER hereunder shall be cumulative

6.4     Payment to LENDER. In the event LENDER completes the Improvements, either before or after default, Owner will pay to LENDER, upon demand, all amounts that may be disbursed in completing the Improvements, together with reasonable compensation to LENDER for extra services rendered by it in completing the Improvements, in excess of the Loan Proceeds and such other funds which have been delivered to LENDER pursuant to this Agreement. Owner's obligation to deliver such excess sum will be secured by the lien of the Security Documents

6.5     Reimbursement of LENDER. Owner shall reimburse LENDER for all costs and expenses incurred by LENDER in connection with any controversy, claim, demand or suit filed in connection with construction of the Improvements, the performance by either party of this Agreement, or Loan Proceeds and such other funds as have been delivered to LENDER pursuant to this Agreement, including all court costs LENDER's reasonable attorneys' fees.

ARTICLE 7. ADDITIONAL PROVISIONS

7.1     Discretion of LENDER. Any provision of this Agreement which provides discretion to LENDER (e.g  "LENDER may", "if required by LENDER", "subject to LENDER's approval" etc.) shall mean LENDER's sole discretion, whether or not that standard is explicitly stated.

7.2     Notices and Copies. All notices or copies referred to herein will be sent certified mail, return receipt requested to LENDER and to Owner at the addresses as shown in the introductory paragraph of this Agreement.

7.3     Amendments. This written Agreement constitutes the entire agreement between parties with respect to the subject matter hereof, may be modified or amended only by a written instrument signed by both LENDER and Owner, and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements between the parties. Notwithstanding the foregoing, the Construction Period may be modified solely by LENDER as set forth in Article 2.1 b. There are no unwritten oral agreements between the parties. No action or omission of LENDER, nor any waiver, acquiescence or course of dealing, will be deemed to affect the specific rights and obligations of the parties as set forth in this Agreement, or constitute an amendment or modification of this Agreement

7.4   Severability. If any of Owner's promises in this Agreement should be held to be unenforceable for any reason, the remaining portions of this Agreement will remain in full force and effect, and be interpreted to the same extent as if such unenforceable provisions originally had not been included in this Agreement. Any part, provision, representation or warranty of the Agreement that is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

7.5   Successors and Assigns. This Agreement will be binding upon, and inure to the benefit of, the heirs, personal representatives, successors and assigns of Owner, and the successor and assigns of LENDER. If the Security Document contains a prohibition against the transfer of Owner's interest in the Property, then Owner's interest in this Agreement will not be assignable without the express written consent of LENDER, which consent may be granted or withheld in LENDER's sole discretion. LENDER may assign its rights without the consent of the Owner.

7.6   Governing Law. This Agreement will be governed by and construed in accordance with the law of the State.

7.7   Time of the Essence. Time is considered of the essence of this Agreement and the satisfaction of the obligations of LENDER and Owner hereunder.

7.8   Borrower-Lender Relationship. This Agreement is made on the basis of a borrower-lender relationship between Owner and LENDER. LENDER will not be considered to constitute a partner, agent or joint venturer of or with Owner or any other party associated with the construction of the Improvements or the ownership of the Property. LENDER will in no manner or respect be liable or responsible, by reason of the provisions hereof, or otherwise, for the payment of any claims growing out of the construction of the Improvements or ownership of the Property by Owner.

7.9   No Third Party Reliance. No third parties, including Contractor, any general contractor, subcontractor, supplier or laborer, will have any rights under this Agreement. This Agreement is made for the sole protection and benefit of Owner and LENDER, and their respective heirs, personal representatives, successors and assigns

7.10 No Waivers of Defaults. Waiver by LENDER of any breach or default by Owner under any terms of the Note, Security Document, or this Agreement shall not be deemed to constitute a waiver of any subsequent breach or default by Owner.


IN WITNESS WHEREOF, Owner and LENDER have executed and delivered this Agreement under seal as of the date first above written.

OWNER:

_____(Seal)          _____(Seal)
Kirby Westheimer


_____(Seal)          _____(Seal)

# EXHIBIT B
# TO VERIFIED COMPLAINT

*7102296632*

# ADJUSTABLE RATE NOTE

### (LIBOR Index-Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT OF MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| September 15, 2008 | PRINCETON | New Jersey |
|---|---|---|
| [Date] | [City] | [State] |

**210 MERCER STREET, PRINCETON, NJ 08540**

[Property Address]

**1.   BORROWER'S PROMISE TO PAY**
      In return for a loan that I have received, I promise to pay U.S. $ 1,500,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Merrill Lynch Credit Corporation .

      I will make all payments under this Note in the form of cash, check or money order.

      I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**
      Interest will be charged on unpaid principal until the full amount of Principal has been paid. Until 04/01/2010, which is the date my permanent loan interest rate commences (the "Commencement Date"), I will pay interest at the yearly rate set forth in paragraph 1 of the Addendum to Note Construction/Permanent Loans attached to this Note. Beginning on the Commencement Date, I will pay interest at a yearly rate based upon the Index (as defined in Section 4(B) below) plus the margin set forth in Section 4(C) below. Solely for the purpose of calculating the initial permanent interest rate, the Note Holder will use the most recent Index figure  available as of the date that construction is actually completed ("Actual Completion Date"), as determined in accordance with the terms of the Construction Loan Agreement of even date. I will pay interest at this rate until the first Change Date, set forth in Section 4(A). The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.   PAYMENTS**
      **(A) Time and Place of Payments**
      Beginning on May 1st, 2010, and on the first day of each month thereafter, I will pay interest only on the unpaid principal balance of the Note until 03/31/2020 . Thereafter, I will pay principal and interest by making payments every month as provided below. I will make my monthly payments on the first day of each month beginning May, 2020 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on April 1st, 2035, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

      I will make my monthly payments at P.O. Box 371458 Pittsburgh, PA 15250-7458, or at a different place if required by the Note Holder.
      **(B) Amount of My Initial Monthly Payments**
      I will be notified by Note Holder of the amount of each of my monthly payments. This amount may change.
      **(C) Monthly Payment Changes**
      Changes in my monthly payment will reflect changes in the unpaid principal of my Loan and in the interest rate that I must pay . The Note Holder will determine my new interest and the changed amount of my monthly payment in accordance with Section 4 of this Note.

      **(D) Withholding**
      If I am a nonresident client, I understand that all payments due hereunder shall be paid without reduction for any taxes, deductions or withholding of any nature. If such tax, deduction or withholding is required by any law to be made from any payment to the Note Holder, I shall continue to pay this Note in accordance with the terms hereof, such that the Note Holder will receive such amount as it would have received had no such tax, deduction or withholding been required.

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**
      **(A) Change Dates**
      The interest rate I will pay will change on the first day of June, 2010, and on that day every month thereafter. Each date on which my adjustable rate could change is called a "Change Date."

      **(B) The Index**
      Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for 1-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date twenty-five (25) days before each Change Date is called the "Current Index."

Multistate Adjustable Rate Note One Month Libor - CONSTRUCTION
0701316 (040903).01

Initials _____

**Original**
(Page 1 of 3)

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding One and Eight Hundred Seventy-Five / Thousandths percentage point(s) (1.875%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

**(i) Interest-Only Period.**

The "interest-only period" is the period from the Commencement Date through 03/31/2020. For the interest-only period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to pay the interest which accrues on the unpaid principal of my loan. The result of this calculation will be the new amount of my monthly payment.

**(ii) Amortization Period.**

The "amortization period" is the period after the interest-only period. For the amortization period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D)   Limits on Interest Rate Changes**

My permanent interest rate, commencing on the first Change Date, will never be greater than my initial permanent interest rate plus five percent (5%), or twelve percent (12%), whichever is greater. My permanent interest rate on the Commencement Date will not be greater than 18%.

**(E)   Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)   Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and *telephone number of a person who will answer any question I may have regarding the notice.*

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.00% of my overdue payment of interest, or principal and interest, as applicable. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.  SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, and a Mortgage 100℠ Pledge Agreement for Securities Account, if applicable, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**  If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12.  OUR COPY**

We/I acknowledge receipt of a signed copy of this Note.

**CAUTION-IT IS IMPORTANT THAT YOU THOROUGHLY READ THIS NOTE BEFORE SIGNING.**

WITNESS the hand(s) and seal(s) of the undersigned.

_____(Seal)          _____(Seal)
**Kirby Westheimer**        -Borrower               -Borrower

_____(Seal)          _____(Seal)
                        -Borrower               -Borrower

_____(Seal)          _____(Seal)
                        -Borrower               -Borrower

_____(Seal)          _____(Seal)
                        -Borrower               -Borrower

[Sign Original Only]

Note: For Florida property only, the State Documentary Tax due on this Note has been paid on the mortgage securing this indebtedness

Multistate Adjustable Rate Note One Month Libor - CONSTRUCTION          Initials ____
2701376 (040903).03                                                     (Page 3 of 3)

## ADDENDUM TO NOTE CONSTRUCTION/PERMANENT LOANS

**THIS ADDENDUM TO NOTE**, is made this 15th day of September 2008 and is incorporated and shall be deemed to amend and supplement the Note made by the undersigned (the "Borrower") to Merrill Lynch Credit Corporation and dated the same date as this Addendum (the "Note").

In addition to the covenants and agreements made in the Note, Borrower and Lender further covenant and agree as follows:

1. _Construction Interest Rate._ The proceeds of the loan evidenced by the Note are to be disbursed according to the terms of the Construction Loan Agreement of same date between Borrower and Lender (the "Construction Loan Agreement"). Notwithstanding the terms of the Note, until the Commencement Date (as defined in the Note) the annual interest rate on the principal balance outstanding at any time under the Note shall be equal to the sum of -0.5% plus the Prime Rate, except as set forth in paragraph 3 (a) below. The "Prime Rate" is the highest Prime Rate published in _The Wall Street Journal_. The Prime Rate for any date on which _The Wall Street Journal_ is not published shall be the Prime Rate in effect on the most recent date on which _The Wall Street Journal_ was published. As of the date of this Addendum to Note, interest shall be paid at the rate of 4.5000% per annum. The interest may change on the first day of each month based on any change in the Prime Rate as of the last day of the preceding month. Until the Commencement Date, the interest rate will never be greater than 18% per annum.

2. _Payments During Construction Term._ Commencing on the first day of the month following the date hereof and continuing on the same day of each succeeding month thereafter, through and including the Commencement Date, Borrower shall make regular scheduled payments of interest only on the amounts disbursed and outstanding.

3. _Commencement Date Change (if applicable)._ If the improvements described in the Construction Loan Agreement are to be completed before or after the Commencement Date, Lender may, at its option, move the Commencement Date to a date which is earlier or later than the date defined in such Note, as more particularly set forth below:

(a) _Interest Rate During Extended Construction Phase._ Borrower shall request an extension of the construction phase at least five days before the Commencement Date, but in no event earlier than sixty days before the Commencement Date. If Lender approves the extension of the term of the construction phase, the interest rate during the extension period shall be calculated be adding -0.5% to the Prime Rate, plus the Construction Extension Margin .2500%. For each additional extension period approved by Lender, the interest rate to be paid by Borrower during such additional extension period shall be calculated precisely in the manner described in the preceding Sentence, except that, for each such extension, the Construction Extension Margin shall increase by an additional .2500%. Lender may evidence the extension of the construction phase by providing written notice of such extension to the Borrower. With the exception of the interest rate, all the terms and conditions of this addendum shall continue to apply during any such extension and Borrower agrees to make payments, at the then applicable interest rate during such extended period(s).

(b) _Rate Reservation._ If the Borrower has entered into a rate reservation agreement, such rate reservation expires on the day preceding the Commencement Date. If Borrower requests an extension of the term of the construction phase, within the frame set forth in subparagraph (a) above, the Borrower has the option either to cap the permanent interest rate or initial permanent rate, as applicable, or "lock-in" such rate, for the duration of the extended construction loan period. Otherwise, the permanent interest rate or initial permanent interest rate, as applicable, will "float" until permanent interest rate is established in accordance with the terms of the Note. If the Borrower does not elect to re-establish rate reservation after it expires, the Borrower's permanent interest rate may be higher than the original rate reserved rate. In the event Borrower elects to re-establish rate reservation, the new rate reservation may result in a rate that is higher than the original capped or locked interest rate and/or the Borrower may have to pay points, depending on the then current market interest rate. In the event construction is not timely completed and the Borrower does not request an extension to the construction phase, the Borrower's interest rate will "float" until the permanent rate is established in accordance with the terms of the Note.

(c)  Extension of Construction Term.  In the event the construction term is extended, Borrower agrees to execute any additional documentation which Lender may request to confirm the extension, the construction interest rate, the maturity date, the permanent interest rate cap or any other term of the Note.  Notwithstanding the foregoing, Lender may unilaterally modify the dates and interest rate consistent with the terms of this Addendum by sending notice to the Borrower and Borrower agrees to be bound by the modified dates and interest rate in making payments.

4.  Change of Permanent Loan Programs.  Provided that no default exists under the terms of the loan documents, Borrower may, prior to the Commencement Date and with the consent of Lender, elect to amend the interest rate provisions of the Note that are applicable as of the Commencement Date.  Lender may offer Borrower a selection from any one or all interest rate programs then being offered by Lender on comparable mortgage loans, provided that Borrower (i) qualifies at that time for the loan type selected based on Lender's then current underwriting criteria, (ii) provides Lender any current financial information requested, and (iii) provided that Lender's lien position is not impaired.  Depending on the Borrower's circumstances, the program may change from a fixed interest rate to an adjustable interest rate, an adjustable interest rate to a fixed interest rate or from one adjustable interest rate program to a different adjustable interest rate program.  Any rate protection agreement in effect will no longer be applicable in the event the Borrower elects to change loan programs.  If Borrower elects to amend the interest rate provisions of the Note, Borrower agrees to execute any and all modification agreements, replacement notes, or other documents that Lender may reasonably require to effectuate the requested change and pay any and all additional closing costs.

In order to exercise the option to select another interest rate program, Borrower must notify Lender in writing of Borrower's selection at least five days before the Commencement Date, but in no event earlier than sixty days before the Commencement Date.

5.  Modification Agreement.  Following the Actual Completion Date, in order to convert the loan to its permanent phase, the Lender will prepare a Modification Agreement reflecting the correct Commencement Date, loan product, maturity date, permanent interest rate and other terms of the permanent loan.  The Modification Agreement shall be executed by the Borrower in accordance with the instructions provided by the Lender and returned to the Lender within twenty calendar days of the date it is mailed to the Borrower by the Lender.  Failure to timely return the Modification Agreement will result in the Modification Agreement being invalid and shall constitute a default under the Note and the Security Instrument and Lender shall be entitled to exercise any and all remedies set forth in the Note and the Security Instrument.  In the event the Borrower fails to timely return the Modification Agreement, Lender, in its sole discretion, may elect to prepare a new Modification Agreement and modify the interest rate to the higher of the interest rate reflected in the Modification Agreement or the interest rate then being charged by Lender on comparable Loan Products.  Interest shall continue to accrue and be payable at the then construction interest rate until receipt by Lender of the executed Modification Agreement.

6.  Waiver of Breach.  The waiver of any breach of the terms of the Note shall not be a construed to be waiver of any other or subsequent breach.

7.  Cross Default.  A default under the terms of the Construction Loan Agreement shall also constitute a default under the terms of the Note.

**BY SIGNING BELOW,** Borrower accepts and agrees to the terms and covenants contained in this Addendum to Note.

_____
Kirby Westheimer                                    -Borrower

_____
                                                            -Borrower

_____
                                                            -Borrower

_____
                                                            -Borrower

_____
                                                            -Borrower

_____
                                                            -Borrower

_____
                                                            -Borrower

_____
                                                            -Borrower

# SIGNATURE/NAME AFFIDAVIT

DATE: September 15, 2008

LOAN #:  7102396632

BORROWER: Kirby Westheimer

THIS IS TO CERTIFY THAT MY LEGAL SIGNATURE IS AS WRITTEN AND TYPED BELOW.
(This signature must <u>exactly</u> match signatures on the Note and Mortgage or Deed of Trust.)

Kirby Westheimer

_____          _____
(Print or Type Name)                                          Signature

(If applicable, complete the following.)

I AM ALSO KNOWN AS:

_____          _____
(Print or Type Name)                                          Signature

_____          _____
(Print or Type Name)                                          Signature

_____          _____
(Print or Type Name)                                          Signature

_____          _____
(Print or Type Name)                                          Signature

and that                                                                                              are one

and the same person.

State/Commonwealth of NJ
County/Parish of MERCER

Subscribed and sworn (affirmed) before me
this 15th                        day of September                    , 2008    _____
                                                                                                    Notary Public in and for
                                                                                                    the State/Commonwealth of NJ
                                                                                                    County/Parish of MERCER
                                                                                                    My Commission Expires:

VMP-304 (0103) 01                    VMP Mortgage Solutions (800)521-7291                              3/01

9/11/2008 12:33 PM

# EXHIBIT C
# TO VERIFIED COMPLAINT

Return To:
**Merrill Lynch Credit
Corporation
9700 Bissonnet Street ,
Suite #1500, HOUSTON, TX
77036**

Prepared By:

**5201 Gate Parkway
Jacksonville, FL 32256**

*Mtg (21pgs) PRB*

*9850*

*230.00 pd*

—————————————[Space Above This Line For Recording Data]—————————————

# MORTGAGE

Loan #: 7102396632

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **September 15, 2008**
together with all Riders to this document.
**(B) "Borrower"** is **Kirby Westheimer, AN UNMARRIED MAN**

Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is **Merrill Lynch Credit Corporation**

Lender is a **Corporation**
organized and existing under the laws of **Delaware**

**NEW JERSEY** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          **Form 3031 1/01**

-6(NJ) (0005)

Page 1 of 15                                Initials: KW

VMP MORTGAGE FORMS - (800)521-7291

VOL 0191 PG 0404

*Original*

Lender's address is **5201 Gate Parkway Jacksonville, FL 32256**

Lender is the mortgagee under this Security Instrument.
**(D) "Note"** means the promissory note signed by Borrower and dated **September 15, 2008**
The Note states that Borrower owes Lender **One Million Five Hundred Thousand Dollars and Zero Cents**                                                                      Dollars
(U.S. $ **1,500,000.00**            ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **April 1st, 2035**.
**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | [X] Other(s) [specify] |
| | | **CONSTRUCTION TO PERM LOAN RIDER** |

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(K) "Escrow Items"** means those items that are described in Section 3.
**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

VMP -6(NJ) (0005)                    Page 2 of 15                    Form 3031 1/01

Initials (KW)

**VOL 1 0 1 9 1 PG 0 4 0 5**                    Original

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the
COUNTY                          of                    MERCER                    :
[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]
**Being more particularly described by a legal description attached hereto and made a part thereof.**

Property Account Number: 09-00038-0001-00002            which currently has the address of
**210 MERCER STREET**                                                                [Street]
**PRINCETON**                                      [City], New Jersey **08540**          [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this

VOL I 0 I 9 I PG 0 4 0 b

Original

*Commonwealth Land Title Insurance Company of New Jersey*

## SCHEDULE C
## LEGAL DESCRIPTION

File No. **ELTS-004323-08**

ALL that certain lot, parcel or tract of land, situate and lying in the Borough of Princeton and Township of Princeton, County of Mercer, State of New Jersey, and being more particularly described as follows:

BEGINNING at a point Beginning at a point in the Southeasterly line of Mercer Street at the northerly corner of the lot of Grace D.E. Richardson and running thence .

(1)     along Mercer Street North 39 degrees 28 minutes East, 121.94 feet to the corner of the lot of John H. Westcott; thence

(2)     along the same South 50 degrees 32 minutes East, 419.30 feet to a point in the line of lands formerly of Charles H. Olden; thence

(3)     along the same South 39 degrees 28 minutes West, 270.10 feet to the easterly corner of lot of Grace D. E. Richardson; thence

(4)     along the same North 31 degrees 04 minutes West, 444.72 feet to the place of BEGINNING.

FOR INFORMATIONAL PURPOSES ONLY: Also known as Lot 2 in Block 38.01 on the Borough of Princeton Tax Map and Lot 12 in Block 10605 on the Township of Princeton Tax Map..

New Jersey Land Title
Insurance Rating Bureau
ALTA Plain Language Commitment 2006          VOL 1 0 1 9 1 PG 0 4 0 7

NJRB 3-08
Effective 2/15/2007
FANJ 3-08

# ADJUSTABLE RATE RIDER
## (LIBOR Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 15th day of September, 2008 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Merrill Lynch Credit Corporation ("Lender") of the same date and covering the property described in the Security Instrument and located at:

210 MERCER  STREET, PRINCETON, NJ 08540

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** As used below, the "Commencement Date" is 04/01/2010 . In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
 The Note provides for changes in the interest rate and the monthly payments, as follows:

**4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   **(A)  Change Dates**
   The interest rate I will pay may change on the first day of June , 2010 and on that day every one (1) month thereafter.  Each date on which my interest rate could change is called a "Change Date."

**Multistate One Month Adjustable Rate Rider - Construction**
0701329 (102802) 01                           *(Page 1 of 3)*

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for 1 month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date twenty-five (25) days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding One and Eight Hundred Seventy-Five / Thousandths percentage point(s) ( 1.875 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

**(i) Interest-Only Period.** The "interest-only period" is the period from the Commencement Date through 03/31/2020 . For the interest-only period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to pay the interest which accrues on the unpaid Principal of my loan. The result of this calculation will be the new amount of my monthly payment.

**(ii) Amortization Period.** The "amortization period" is the period after the interest-only period. For the amortization period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

My permanent interest rate, commencing on the first Change Date, will never be greater than my initial permanent interest rate plus five percent (5%), or twelve percent (12%), whichever is greater. My permanent interest rate on the Commencement Date will not be greater than 18%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**Multistate One Month Adjustable Rate Rider - Construction**
0701329 (100702).02                                                                                              *(Page 2 of 3)*

VOL·1019 1 PG0409

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____(Seal)    _____(Seal)
Kirby Westheimer   -Borrower          -Borrower

_____(Seal)    _____(Seal)
          -Borrower          -Borrower

_____(Seal)    _____(Seal)
          -Borrower          -Borrower

_____(Seal)    _____(Seal)
          -Borrower          -Borrower

**Multistate One Month Adjustable Rate Rider -Construction**
0701329 (100703).03

*(Page 3 of 3)*

## CONSTRUCTION/PERMANENT LOAN RIDER

**THIS CONSTRUCTION/PERMANENT LOAN RIDER**, dated September 15, 2008 , is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to Merrill Lynch Credit Corporation (the "Lender") of the same date.

**ADDITIONAL COVENANTS:** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

1. <u>Future Advances.</u> The Security Instrument secure advances made, and future advances to be made, pursuant to the terms of a Construction Loan Agreement between Borrower and Lender of the same date. A default under the terms of Construction Loan Agreement and/or the Note shall also constitute a default under the terms of the Security Instrument.

2. <u>Construction Interest Rate.</u> During the period of construction as set forth in the Construction Loan Agreement and until the 03/31/2010 (the "Scheduled Termination Date"), the interest rate may change on the first day of each month and shall be equal to the sum of -0.5% plus the highest prime rate published in *The Wall Street Journal* as of the last business day of the preceding month (the "Prime Rate"), except as set forth in paragraph 3 below. During this period and until the permanent financing phase of the loan begins, the interest rate will never be greater than 18%.

3. <u>Commencement Date Change (if applicable).</u> If the improvements described in the Construction Loan Agreement are to be completed before or after 04/01/2010 (the "Commencement Date"), Lender may, at its option, move the Commencement Date to a date which is earlier or later than the date defined as such in the Note, as more particularly set forth below:

(a) <u>Interest Rate During Extended Construction Phase.</u> Borrower shall request an extension of the construction phase at least five days before the Commencement Date, but in no event earlier than sixty days before the Commencement Date. If the Lender approves the extension of the terms of the construction phase, the interest rate during the extension periods shall be calculated by adding -0.5% to the Prime Rate, plus the Construction Extension Margin of .2500% . For each additional extension period approved by Lender, the interest rate to be paid by Borrower during such additional extension period shall be calculated precisely in the manner described in the preceding sentence, except that, for each such extension, the Construction Extension Margin shall increase by an additional .2500% . Lender may evidence the extension of the construction phase by providing written notice of such extension to the Borrower. An extension of the term of the construction phase may result in an extension of the maturity date of the Security Instrument. With the exception of the interest rate, all the terms and conditions of this Rider shall continue to apply during any such extension and Borrower agrees to make payments, at the then applicable interest rate during such extended period(s)

(b) <u>Rate Protection.</u> If the Borrower has entered into a rate protection agreement, such rate protection expires on the day preceding the Commencement Date. If Borrower request and extension of the term of the construction phase, within the time frame set forth in subparagraph (a) above, the Borrower has the option to cap the permanent interest rate or initial permanent interest rate, as applicable, for the duration of the extended construction loan period or allow the permanent interest rate or initial permanent interest rate, as applicable, to "float" until the permanent interest rate is established in accordance with the terms of the Note. If the Borrower does not elect to re-cap the interest rate, the Borrower's permanent interest rate may be higher than the original capped rate. In the event the Borrower elects to re-cap the interest rate, the new capped rate may be higher than the original capped interest rate and/or the Borrower may have to pay points, depending on the then current market interest rate. In the event construction is not timely completed and the Borrower does not request an extension to the construction phase, the Borrower's interest rate will "float" until the permanent rate is established in accordance with the terms of the Note.

0701492 (121702).01

(c) Extension of Construction Term. In the event the construction term is extended, Borrower agrees to execute any additional documentation which Lender may request to confirm the extension, the construction interest rate, the maturity date, the permanent interest rate cap or any other term of the Note. Notwithstanding the foregoing, Lender may unilaterally modify the dates and interest rate consistent with the terms of this Rider by sending notice to the Borrower and Borrower agrees to be bound by the modified dates and interest rate in making payments.

4. Change of Permanent Loan Programs. Provided that no default exists under the terms of the loan documents, Borrower may, prior to the Commencement Date and with the consent of Lender, elect to amend the interest rate provisions of the Note that are applicable as of the Commencement Date. Lender may offer Borrower a selection from any one or all of the interest rate programs then being offered by Lender on comparable loan products, provided that Borrower (i) qualifies at the time for the loan type selected based on Lender's then current underwriting criteria, (ii) provides Lender any current financial information requested, and (iii) provided that Lender's lien position is not impaired. Depending on the Borrower's circumstances, the program may change from a fixed interest rate to an adjustable rate, an adjustable interest rate to a fixed interest rate or from one adjustable interest rate program to a different adjustable interest rate program. Any rate protection agreement in effect will no longer be applicable in the event the Borrower elects to change loan programs. If Borrower elects to amend the interest rate provisions of the Note, Borrower agrees to execute any and all modification agreements, replacement notes, or other documents that Lender may reasonably require to effectuate the requested change and pay any and all additional closing costs.

In order to exercise the option to select another interest rate program, Borrower must notify Lender in writing of Borrower's selection at least five days before the Commencement Date, but in no event earlier than sixty days before Commencement Date.

5. Modification Agreement. Following the Actual Completion Date, as defined in the Construction Loan Agreement, in order to convert the loan to its permanent phase, the Lender will prepare a Modification Agreement reflecting the correct Commencement Date, loan product, maturity date, permanent interest rate and other terms of the permanent loan. The Modification Agreement shall be executed by the Borrower in accordance with instructions provided by the Lender and returned to the Lender within twenty calendar days of the date it is mailed to the Borrower by the Lender. Failure to timely return the Modification Agreement will result in the Modification Agreement being invalid and shall constitute a default under the Note and the Security Instrument and Lender shall be entitled to exercise any and all remedies set forth in the Note and Security Instrument. In the event the Borrower fails to timely return the Modification Agreement, Lender, in its sole discretion, may elect to prepare a new Modification Agreement and modify the interest rate to the higher of the interest rate reflected in the Modification Agreement or the interest rate then being charged by Lender on comparable loan products. Interest shall continue to accrue and be payable at the then construction interest rate until receipt by Lender of the executed Modification Agreement.

**BY SIGNING BELOW,** Borrower(s) accepts and agrees to the terms and covenants contained in this Rider.

_____ (Seal)         _____ (Seal)
Kirby Westheimer

_____ (Seal)         _____ (Seal)

_____ (Seal)         _____ (Seal)

_____ (Seal)         _____ (Seal)

6701492 (050685).02

Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. If Lender accepts such payments, it shall apply such payments at the time such payments are accepted. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts



Original

VOL 1 0 1 9 1 PG 0 4 1 3

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the



VOL 1 0 1 9 1 PG 0 4 1 4                                                     Original

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

VOL I 0 I 9 I PG 0 4 I 5                    **Original**

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Initials 

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**





**(b)** Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.



**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials: (KWJ)

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the

-6(NJ) (0005)                    Page 11 of 15                    Initials:                     Form 3031 1/01

VOL 1 0 1 9 1 PG 0 4 2 0

new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

 -6(NJ) (0005)

Page 12 of 15

 Initials

Form 3031 1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure required under the Fair Foreclosure Act, codified at Sections 2A:50-53 et seq. of the New Jersey Statutes, or other Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. No Claim of Credit for Taxes.** Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.



VIII 1 0 1 9 1 PG 0 4 2 2

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____                    _____ (Seal)
                                                    **Kirby Weatheimer**                -Borrower

_____                    _____ (Seal)
                                                                                       -Borrower

_____ (Seal)             _____ (Seal)
                          -Borrower                                                    -Borrower

_____ (Seal)             _____ (Seal)
                          -Borrower                                                    -Borrower

_____ (Seal)             _____ (Seal)
                          -Borrower                                                    -Borrower

-6(NJ) (0005)                    Page 14 of 15                    Form 3031 1/01

STATE OF NEW JERSEY, MERCER                                    County ss:

On this **15th**           day of **September, 2008**                , before me, the subscriber,
personally appeared **Kirby Westheimer**

                                                                        who, I am satisfied,
is/are the person(s) named in and who executed the within instrument, and thereupon acknowledged that
he/she/they signed, sealed and delivered the same as his/her/their act and deed, for the purposes therein
expressed.

Notary Public

-6(NJ) (0005).02                    Page 15 of 15                  Initial          Form 3031 1/01

VOL I 0 I 9 I PG 0 4 2 4



Mercer County Clerk's Office

<u>Return To:</u>

      MERRILL LYNCH CREDIT CORP
      9700 BISSONNET STREET
      SUITE 1500
      HOUSTON  TX  77036

Index   MORTGAGE BOOK

Book   10191   Page  0403

No. Pages   0022

Instrument   MORTGAGES

Date :   10/06/2008

Time :   3:07:30

Control #   200810060528

INST#      RD 2008 035182

WESTHEIMER
KIRBY
MERRILL LYNCH CREDIT CORP

Employee ID   LISAC

| | | |
|---|---|---|
| RECORDING | $ | 55.00 |
| RECORDING | $ | 70.00 |
| DARM $3 | $ | 63.00 |
| NMD1PA | $ | 42.00 |
| | $ | .00 |
| | $ | .00 |
| | $ | .00 |
| | $ | .00 |
| | $ | .00 |

Total:   $   230.00

STATE OF NEW JERSEY
Mercer County Clerk's Office

*********PLEASE NOTE***********************
* DO NOT REMOVE THIS COVER SHEET -    *
*IT CONTAINS ALL RECORDING INFORMATION   *
*******************************************

      Paula Sollami-Covello
      Mercer County Clerk



M101910403MTGPRB

VOL10191PG0403

# EXHIBIT D
# TO VERIFIED COMPLAINT



**RIKER
DANZIG
SCHERER
HYLAND
PERRETTI**LLP

ATTORNEYS AT LAW

**Jonathan P. Vuotto**
Attorney

Direct:
t: 973.451.8573
f: 973.451.8721
jvuotto@riker.com
Reply to: Morristown

May 21, 2012

_**Via Certified Mail, R.R.R., and Regular Mail**_

Mr. Kirby Westheimer
210 Mercer Street
Princeton, New Jersey 08540

## NOTICE OF INTENTION TO ACCELERATE AND FORECLOSE

**Re:** **Adjustable Rate Note, by Kirby Westheimer ("Borrower" or "you"), dated September 15, 2008 in the original principal amount of $1,500,000.00 (the "Note"), Mortgage dated September 15, 2008 ("Mortgage") by Borrower granting 210 Mercer Street, Princeton, New Jersey 08540, (Borough of Princeton Tax Map: Lot 2, Block 38.01; Township of Princeton Tax Map: Lot 12, Block 10605) as collateral (the "Mortgaged Premises"), and Construction Loan Agreement, Loan No. 7102396632, dated September 15, 2008 (the Note, Mortgage, and Construction Loan Agreement are collectively referred to as the "Loan Documents"); Loan Number 7102396632**

Dear Mr. Westheimer:

This firm represents the Bank of America, Successor in interest to Merrill Lynch Credit Corporation (the "Lender"), in connection with the above-referenced loan. We refer you to the above-referenced Loan Documents and the documents executed in connection therewith. All capitalized terms herein shall have the same meaning as prescribed in the Loan Documents, unless otherwise indicated.

You have failed to comply with the terms of the Loan Documents by failing to complete the construction of the project contemplated within the Loan Documents by April 1, 2010. Pursuant to the New Jersey Fair Foreclosure Act ("FFA"), N.J.S.A. 2A:50-53, _et seq._, the Lender is providing you with this Notice of Intention to Foreclose.

**Pursuant to the FFA, you have the right to cure your default and reinstate the Note and Mortgage.** To cure the default, you must complete the construction project, as contemplated in the Loan Documents and specified in the Plans and Specifications delivered to and approved by the Lender. As provided in the Construction Loan Agreement § 3.8, the following conditions must be met in order to cure the default:

Headquarters Plaza, One Speedwell Avenue, Morristown, NJ 07962-1981 • t: 973.538.0800 f: 973.538.1984
50 West State Street, Suite 1010, Trenton, NJ 08608-1220 • t: 609.396.2121 f: 609.396.4578
500 Fifth Avenue, New York, NY 10110 • t: 212.302.6574 f: 212.302.6628
London Affiliate: 33 Cornhill, London EC3V 3ND, England • t: +44 (0) 20.7877.3270 f: +44 (0) 20.7877.3271
www.riker.com

Mr. Kirby Westheimer
May 21, 2012
Page 2

1.  An inspector approved by the Lender must certify to Lender that (a) the physical construction of the Improvements has been completed in strict compliance with the Plans and Specifications and (b) all utilities serving the Property must be connected and operating;

2.  The Final Survey must show that all Improvements lie entirely within the boundary and setback lines of the Property and do not encroach upon any easements or rights-of-way on the Property and which is otherwise satisfactory to Lender;

3.  The final certificate of occupancy (or its local equivalent) must be issued for the Improvements by the governmental authorities having jurisdiction over the Improvements which confirms that construction of the Improvements have been completed in accordance with all applicable requirements. If a certificate of occupancy is not required by local law, evidence that the Improvements have passed all inspections and received all approvals which are conditions precedent to occupancy of the Improvements must be furnished;

4.  The Lender must receive a final lender's policy of title insurance in form and substance satisfactory to the Lender in its sole discretion and Owner must execute any and all documents, instruments, and affidavits to induce title company to issue such policy; and

5.  Proof of hazard insurance listing the Lender as loss payee and flood insurance, if applicable.

Proof of satisfaction of the above requirements shall be provided to PHH Mortgage Services and addressed to 5201 Gate Parkway, Jacksonville, FL 32256, attn: Julie Halliday, who can be reached at 1-888-421-0879, ext. 94177.

**If you fail to cure your default by June 18, 2012, the Lender may take steps to terminate your ownership of the Mortgaged Premises by commencing a foreclosure suit in a court of competent jurisdiction.** If the Lender takes steps to commence a foreclosure action, you will still have the right to cure your default, but will be responsible for the Bank's attorneys' fees and costs of suit in an amount not to exceed the amount permitted by the New Jersey Rules of Court. You may have the right to transfer the property to another person subject to the security interest and the transferee may have the right to cure the default as provided by the FFA.

**You are advised to seek counsel from an attorney of your choosing concerning your residential mortgage default situation.** If you are unable to obtain an attorney, you may communicate with the New Jersey Bar Association or Lawyer Referral Services in Mercer County. If you are unable to afford an attorney, you may communicate with the Legal Services Office in Mercer County. A list of the addresses and phone numbers of these offices is attached.

Be advised that there may be the possible availability of financial assistance for curing a default from programs operated by the State or federal government or non-profit organizations, if any, as identified by the Commissioner of Banking and Insurance. Section 5 of the "Fair Foreclosure

Mr. Kirby Westheimer
May 21, 2012
Page 3

Act" provides that this requirement shall be satisfied by attaching a list, a copy of which is attached, of such programs promulgated by the commissioner.

**If you disagree with the Lender's assertion that (i) a default under the Loan has occurred or (ii) with the performance identified above that is required to cure the default, you may contact the undersigned or Julie Halliday at 1-888-421-0879, ext. 94177.**

UNLESS YOU NOTIFY US IN WRITING WITHIN THIRTY (30) DAYS AFTER RECEIPT OF THIS LETTER THAT THE OUTSTANDING PERFORMANCE, OR ANY PART OF IT, IS DISPUTED, THE LENDER WILL ASSUME THAT THE SUCH DEMAND FOR PERFORMANCE IS VALID. IF YOU DO NOTIFY US OF A DISPUTE, WE WILL OBTAIN VERIFICATION OF THE OUTSTANDING PERFORMANCE AND MAIL IT TO YOU. FURTHER, UPON YOUR WRITTEN REQUEST WITHIN THIRTY (30) DAYS, WE WILL PROVIDE YOU WITH THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR IF DIFFERENT FROM THE CURRENT CREDITOR. THIS COMMUNICATION IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

Sincerely,

Jonathan P. Votto

Enclosure

cc:    Stephen Winkles, Esq. (via regular mail only)

**NEW JERSEY STATE BAR ASSOCIATION**
New Jersey Law Center
One Constitution Square
New Brunswick, New Jersey 08901-1520
Phone: (732) 249-5000


**MERCER COUNTY BAR ASSOCIATION LAWYER REFERRAL SERVICE**
1245 Whitehorse Mercerville Road, Suite 420
Mercerville, New Jersey 08619-3894
Phone: (609) 585-6200


**MERCER COUNTY LEGAL SERVICES**
Central Jersey Legal Services
198 West State Street
Trenton, New Jersey 08608
Phone: (609) 695-6249

## Fair Foreclosure Act Notice of Intention to Foreclose - List of Entities Providing Assistance

The following is a list of governmental and non-profit entities that may provide financial assistance or counseling to borrowers in foreclosure.

| | | |
|---|---|---|
| **American Credit Alliance, Inc.**<br>26 S. Warren St.<br>Trenton, NJ 08608<br>**609-393-5400** | **Atlantic Human Resources, Inc.**<br>1 S. New York Ave.<br>Atlantic City, NJ 08401<br>**609-348-4131** | **Consumer Credit Counseling Service of Central New Jersey**<br>1931 Nottingham Way<br>Hamilton, NJ 08619<br>**609-586-2574** |
| **Consumer Credit Counseling Service of New Jersey**<br>185 Ridgedale Ave.<br>Cedar Knolls, NJ 07927-1812<br>**973-267-4324** | **Fair Housing Council of Northern New Jersey**<br>131 Main St.<br>Hackensack, NJ 07601<br>**201-489-3552** | **Garden State Consumer Credit Counseling, Inc.**<br>225 Willowbrook Road<br>Freehold, NJ 07728<br>**1-800-992-4557** |
| **Jersey Counseling & Housing Development, Inc.**<br>29 S. Blackhorse Pike<br>Blackwood, NJ 08012<br>**856-227-3683** | **Jersey Counseling & Housing Development, Inc.**<br>1040 S. Broadway<br>Camden, NJ 08104<br>**856-541-1000** | **Mercer County Hispanic Association**<br>200 E. State St., 2nd Floor<br>Trenton, NJ 08607<br>**609-392-2446** |
| **Middlesex County Economic Opportunities Corporation**<br>1215 Livingston Ave.<br>North Brunswick, NJ 08902<br>**732-790-3344** | **Monmouth County Human Services**<br>Housing Services Unit<br>P.O. Box 3000<br>Freehold, NJ 07728<br>**732-431-7998** | **NJ Citizen Action** (*main office/financial education center*)<br>744 Broad St., Suite 2080<br>Newark, NJ 07102<br>**973-643-8800**<br>**1-800-NJ-OWNER** (loan counseling)<br>**1-888-TAXES-11** (free tax preparation assistance) |
| **NJ Citizen Action** (*Central Jersey*)<br>85 Raritan Ave., Suite 100<br>Highland Park, NJ 08904<br>**732-246-4772** | **NJ Citizen Action** (*South Jersey*)<br>2 Riverside Drive, Suite 362<br>Camden, NJ 08103<br>**856-966-3091** | **Ocean Community Economic Action Now, Inc.**<br>22 Hyers St.<br>Toms River, NJ 08753-0773<br>**732-244-2351, ext. 2** |
| **Paterson Coalition for Housing, Inc.**<br>262 Main St., 5th Floor<br>Paterson, NJ 07505<br>**973-684-5998** | **Paterson Task Force for Community Action, Inc.**<br>155 Ellison St.<br>Paterson, NJ 07505<br>**973-279-2333** | **Puerto Rican Action Board**<br>**Housing Coalition Unit**<br>90 Jersey Ave.<br>New Brunswick, NJ 08903<br>**732-249-9700** |
| **Tri-County Community Action Agency, Inc.**<br>110 Cohansey St.<br>Bridgeton, NJ 08302<br>**856-451-6330** | **Urban League for Bergen County**<br>106 W. Palisade Ave.<br>Englewood, NJ 07631<br>**201-568-4988** | **Urban League for Essex County**<br>508 Central Ave.<br>Newark, NJ 07101<br>**973-624-9535** |
| **Urban League of Union County**<br>288 N. Broad St.<br>Elizabeth, NJ 07208<br>**908-351-7200** | **Homelessness Prevention Program**<br>New Jersey Department of Community Affairs<br>**(866) 689-6270\*** | |

*\*Basic eligibility is limited to: (a) single family owner/occupied dwellings with all those on the deed and mortgage occupying the house; (b) no more than one mortgage or lien encumbrance on the property; (c) no initiated or ongoing bankruptcy. Assistance will be in the form of a loan, and a lien will be placed on the property. The family must document the financial reason for nonpayment. At the time of the eligibility decision, the household must have and document income sufficient to support the household and repay the loan. There is a fee for the credit check and property search.*



UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Print your name, address and ZIP+4 below •

RIKER DANZIG ET AL LLP
ONE SPEEDWELL AVENUE
PO BOX 1981
MORRISTOWN NJ 07962-1981

Attn: Jonathan Vuotto



2. Article Number

7160 3901 9846 4113 8050

3. Service Type   CERTIFIED MAIL

4. Restricted Delivery? *(Extra Fee)*          ☐ Yes

1. Article Addressed to:

Mr. Kirby Wastheimer
210 Mercer Street
Princeton, NJ 08540

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)     B. Date of Delivery
                                            5 22 12

C. Signature
X                                          ☐ Agent
                                           ☐ Addr.

D. Is delivery address different from Item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

23317/13  #990

PS Form 3811, January 2005          Domestic Return Receipt