# EXHIBIT B

GRUHIN & GRUHIN, P.A.
Paul J. Linker (PL8642)
155 Prospect Avenue
Suite 100
West Orange, New Jersey 07052
(973) 325-7000
Attorneys for Defendant-Counterclaimant, Kirby Westheimer

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BANK OF AMERICA, N.A., successor in interest to MERRILL LYNCH CREDIT CORPORATION, by and through its servicer and attorney-in-fact, PHH MORTGAGE CORPORATION, | Civil Action No.: 12-7080-JAP-LHG |
| Plaintiff-Counterclaim/Defendant, | |
| vs. | |
| KIRBY WESTHEIMER and JOHN DOE #1 through JOHN DOE #40, inclusive, | **ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM** |
| Defendant-Counterclaimant. | |

Defendant, Kirby Westheimer ("Defendant"), through his attorneys, Gruhin & Gruhin,

P.A., by way of answer to the Verified Complaint ("Complaint") of plaintiff, Bank of America,

N.A. ("Plaintiff"), successor in interest to Merrill Lynch Credit Corporation, by and through its

servicer and attorney-in-fact, PHH Mortgage Corporation, says:

**PARTIES**

1.      Answering paragraph 1, Defendant lacks knowledge or information sufficient to

form a belief as to the allegations contained therein.

2.      Answering paragraph 2, except to admit that he is an individual, citizen and

domiciliary of New Jersey, Defendant denies the remaining allegation contained therein.

3.      Answering paragraph 3, Defendant makes no response to the allegations contained therein as same are not directed against him, and accordingly, no response is required.

## JURISDICTION AND VENUE

4.      Answering paragraph 4, except to admit that the amount in controversy exceeds $75,000.00, Defendant denies the remaining allegations contained therein.

5.      Answering paragraph 5, Defendant states that no answer is required to the extent that the allegations contained therein call for a legal conclusion.  To the extent a response is required, Defendant admits that the Complaint seeks to lay venue in this district.

## FACTS

6.      Answering paragraph 6, except to admit his execution of the Construction Loan Agreement ("Loan Agreement") in the aggregate principal amount of $1,500,000.00, Defendant states that no answer is required as the allegations contained therein call for a legal conclusion. To the extent a response is required, Defendant refers to the Agreement for a complete and accurate statement of its terms.

7.      Answering paragraph 7, Defendant admits that a partial copy of the Loan Agreement purports to be attached as **Exhibit A** to the Complaint, notwithstanding that said document was not executed by Plaintiff or on its behalf and is incomplete.

8.      Answering paragraph 8, except to admit his execution and delivery of the Adjustable Rate Note ("Note") in the aggregate principal amount of $1,500,000.00, Defendant states that no answer is required as the allegations contained therein call for a legal conclusion. To the extent a response is required, Defendant refers to the Note for a complete and accurate statement of its terms.

2

9.      Answering paragraph 9, Defendant admits that a copy of the Note purports to be attached as **Exhibit B** to the Complaint.

10.     Answering paragraph 10, except to admit his execution and delivery of the Mortgage, Defendant states that no answer is required to the remaining allegations contained therein as same call for a legal conclusion.  To the extent a response is required, Defendant refers to the Mortgage for a complete and accurate statement of its terms.

11.     Answering paragraph 11, Defendant admits that a copy of the Mortgage purports to be attached as **Exhibit C** to the Complaint, inasmuch as the document is not complete.

12.     Answering paragraph 12, Defendant lacks knowledge or information sufficient to form a belief as to the allegations contained therein.

13.     Answering paragraph 13, Defendant makes no response thereto as it does not contain factual allegations, and accordingly, no response is required.

14.     Answering paragraph 14, Defendant denies the allegations contained therein.

15.     Answering paragraph 15, except to admit his receipt of the May 21, 2012 letter, Defendant refers to same for a complete and accurate statement of its contents.

16.     Answering paragraph 16, Defendant admits that a copy of the letter purports to be attached as **Exhibit D** to the Complaint.

17.     Answering paragraph 17, Defendant denies the allegations contained therein.

18.     Answering paragraph 18, Defendant denies the allegations contained therein.

19.     Answering paragraph 19, Defendant lacks knowledge or information sufficient to form a belief as to the allegations contained therein.

20.     Answering paragraph 20, Defendant denies the allegations contained therein.

n:\tax\1elght\client\sheiner, kirby\216 answer about, princeton - bank of amerian foreclosure action\answer 2-4-13_v 3_clean.doc

21.     Answering paragraph 21, Defendant lacks knowledge or information sufficient to form a belief as to the allegations contained therein.

22.     Answering paragraph 22, Defendant lacks knowledge or information sufficient to form a belief as to the allegations contained therein.

23.     Answering paragraph 23, Defendant makes no response thereto as it does not contain factual allegations, and accordingly, no response is required.

## CAUSE OF ACTION FOR FORECLOSURE OF MORTGAGE

24.     Answering paragraph 24, Defendant repeats and realleges each of his responses to the allegations contained in paragraphs 1-23, inclusive, as if set forth *verbatim* and at length herein.

25.     Answering paragraph 25, Defendant states that no answer is required to the extent that the allegations contained therein call for a legal conclusion, and otherwise, refers to the Mortgage for a complete and accurate statement of its terms.

26.     Answering paragraph 26, Defendant denies the allegations contained therein.

27.     Answering paragraph 27, Defendant denies the allegations contained therein.

28.     Answering paragraph 28, except to admit that he is now in possession of the real Property (said term being defined in the Complaint), Defendant denies the remaining allegations contained therein.

29.     Answering paragraph 29, Defendant states that no answer is required to the extent that the allegations contained therein call for a legal conclusion.  To the extent that a response is required, Defendant denies the allegations of said paragraph.

30.     Answering paragraph 30, Defendant states that no answer is required to the extent that the allegations contained therein call for a legal conclusion.  To the extent that a response is required, Defendant denies the allegations of said paragraph.

31.     Answering paragraph 31, Defendant states that no answer is required to the extent that the allegations contained therein call for a legal conclusion.  To the extent that a response is required, Defendant denies the allegations of said paragraph.

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

The Complaint and each of the claims for relief alleged therein are barred because the Court lacks subject matter jurisdiction over same in the absence of complete diversity between the parties, and Defendant reserves his rights to move, at or before the time of trial, to dismiss the Complaint.

## SECOND AFFIRMATIVE DEFENSE

The Complaint and each of the claims for relief alleged therein should be dismissed because Plaintiff lacks standing to prosecute the within action, and Defendant reserves his rights to move, at or before the time of trial, to dismiss the Complaint.

## THIRD AFFIRMATIVE DEFENSE

The Complaint and each of the claims for relief alleged therein fail to state claims upon which relief may be granted and Defendant reserves his rights to move, at or before the time of trial, to dismiss the Complaint.

## FOURTH AFFIRMATIVE DEFENSE

The Loan allegedly due and owing to Plaintiff from Defendant is secured by the Property whose value exceeds the amounts due and owing to Plaintiff under the Loan Documents (as each

5

of the terms "Loan," "Property" and "Loan Documents" are defined, as applicable, in the Counterclaim).

### FIFTH AFFIRMATIVE DEFENSE

The Complaint and each of the claims for relief alleged therein are barred, in whole or in part, because of Plaintiff's own material breaches of the Loan Documents which were the cause of its damages, if any.

### SIXTH AFFIRMATIVE DEFENSE

The Complaint and each of the claims for relief alleged therein are barred because of the failure of consideration to which Defendant was entitled to, but did not receive under and pursuant to the Loan Documents, from Plaintiff's agents, representatives, servants, officers and/or employees (collectively, "Agents") in connection with the administration, oversight, supervision and monitoring of the Loan, including but not limited to, the manner and means by which the Property was inspected and the Loan proceeds were drawn, reduced and/or otherwise disbursed ("Administration"); all of which conduct and actions are imputed to Plaintiff.

### SEVENTH AFFIRMATIVE DEFENSE

The Complaint and each of the claims alleged or relief sought therein are barred, in whole or in part, because Plaintiff's damages, if any, were caused by the consequences of its own actions and/or conduct and/or those of its Agents in connection with the Administration of the Loan, including but not limited to, the manner and means by which the Loan proceeds were drawn, reduced and/or otherwise disbursed; all of which conduct and actions are imputed to Plaintiff.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff is estopped and precluded by the actions, inactions and/or conduct of its Agents (all of which actions, inactions and/or conduct are imputed to it) to complain of Defendant's alleged actions, inactions and/or conduct, and accordingly, Plaintiff is barred from seeking any relief herein.

## NINTH AFFIRMATIVE DEFENSE

The Complaint and each of the claims for relief alleged therein are barred, in whole or in part, because they have been waived on account of the actions, inactions and/or conduct of Plaintiff and/or its Agents; all of which actions, inactions and/or conduct are imputed to Plaintiff.

## TENTH AFFIRMATIVE DEFENSE

The Complaint and each of the claims for relief alleged therein are barred, in whole or in part, by the doctrine of unjust enrichment.

## ELEVENTH AFFIRMATIVE DEFENSE

Defendant asserts that Plaintiff suffered none of the purported injuries and/or damages alleged in the Complaint, and that same, if any, were caused proximately, directly or otherwise, in whole or part, or alternatively, were contributed to by the actions, inactions and/or conduct of Plaintiff and/or its Agents, including but not limited to, the Administration of the Loan and the manner and means by which the Loan proceeds were drawn, reduced and/or otherwise disbursed; all of which conduct and actions are imputed to Plaintiff.

## TWELFTH AFFIRMATIVE DEFENSE

The Complaint and each of the claims for relief alleged therein are barred, in whole or part, because Plaintiff and/or its Agents knew and/or in the exercise of reasonable care and due

diligence should have known some and/or all of the actions and/or conduct of Defendant as alleged therein.

### THIRTEENTH AFFIRMATIVE DEFENSE

The Complaint and each of the claims for relief alleged therein are barred, in whole or part, because Plaintiff did not act reasonably to protect itself from and/or failed to mitigate any purported injuries and/or damages which it allegedly sustained.

### FOURTEENTH AFFIRMATIVE DEFENSE

Defendant asserts that Plaintiff suffered none of the purported injuries and/or damages alleged in the Complaint, and that same, if any, occurred solely as the result of unavoidable and/or unforeseeable events not connected with Defendant, but rather of one or more third-parties over whom he had no control.

### FIFTEENTH AFFIRMATIVE DEFENSE

The Complaint and each of the claims for relief alleged therein are barred, in whole or part, by the doctrine of laches in that Plaintiff failed to assert its alleged claims within a reasonable period of time, and such delay has been to the detriment and prejudice of Defendant.

### SIXTEENTH AFFIRMATIVE DEFENSE

Defendant asserts that Plaintiff suffered none of the purported injuries and/or damages alleged in the Complaint, and that same, if any, arose out of risks attendant to the negotiation, execution, and thereafter, the effectuation of the Loan Documents, including but not limited to, general economic and/or market conditions and/or forces, all of which Plaintiff had full knowledge of and as to which it knowingly, willingly and voluntarily assumed.

8

## SEVENTEENTH AFFIRMATIVE DEFENSE

Defendant asserts that Plaintiff suffered none of the purported injuries and/or damages alleged in the Complaint, and that recovery for same, if any, is barred, diminished and/or reduced by virtue of the fact that they were not reasonably foreseeable or contemplated both before and also at the time the Loan Documents were negotiated, executed, and thereafter, effectuated.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Defendant asserts that Plaintiff suffered none of the purported injuries and/or damages set forth in the Complaint and that same, if any, were caused proximately, directly and/or otherwise, in whole or in part, or alternatively, were contributed to by the negligence, gross negligence, recklessness, lack of due diligence and/or reasonable care of and/or other actions, inactions and/or conduct of Plaintiff and/or its Agents in connection with the Administration of the Loan, and the manner and means by which the Loan proceeds were drawn, reduced and/or otherwise disbursed; all of which conduct and actions are imputed to Plaintiff.

## NINETEENTH AFFIRMATIVE DEFENSE

The Complaint and each of the claims for relief alleged therein are barred, in whole or part, by the doctrine of promissory estoppel in that Defendant reasonably relied upon the material representations, statements, conduct and/or actions of Plaintiff and/or its Agents in connection with the negotiation, execution, and thereafter, the effectuation of the Loan Documents to his ultimate damage and detriment in connection with the Administration of the Loan and the manner and means by which the Loan proceeds were drawn, reduced and/or otherwise disbursed; all of which conduct and actions are imputed to Plaintiff.

### TWENTIETH AFFIRMATIVE DEFENSE

The Complaint and each of the claims for relief alleged therein are barred, in whole or part, by Plaintiff's potential windfall in pursuing the within action.

### TWENTY-FIRST AFFIRMATIVE DEFENSE

The Complaint and each of the claims for relief alleged therein are barred, in whole or part, by the doctrine of unclean hands, including in connection with the Administration of the Loan and the manner and means by which the Loan proceeds were drawn, reduced and/or otherwise disbursed; all of which conduct and actions are imputed to Plaintiff.

### TWENTY-SECOND AFFIRMATIVE DEFENSE

The Complaint and each of the claims for relief alleged therein are barred, in whole or part, by the doctrines of economic duress and unconscionability.

### TWENTY-THIRD AFFIRMATIVE DEFENSE

The Complaint and each of the claims for relief alleged therein are barred, in whole or part, as a result of Plaintiff's material breaches of the implied duties of good faith and fair dealing which it owed to Kirby in connection with the negotiation, execution, and thereafter, the effectuation of the Loan Documents.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE

The Complaint and each of the claims for relief alleged therein are barred, in whole or part, by virtue of Plaintiff's material breaches of the duties of good faith, honesty and integrity owing to Defendant in connection with the negotiation, execution, and thereafter, the effectuation of the Loan Documents.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

By way of set-off, Defendant affirmatively states that whatever monies are purportedly due Plaintiff (and Defendant denies any such obligation) are exceeded by the damages sustained by Defendant as a direct and proximate result of the actions, inactions and/or conduct of Plaintiff and/or its Agents in connection with the Administration of the Loan and the manner and means by which the Loan proceeds were drawn, reduced and/or otherwise disbursed; all of which conduct and actions are imputed to Plaintiff.

## COUNTERCLAIM

Defendant-Counterclaimant, Kirby Westheimer ("Kirby"), through his attorneys, Gruhin & Gruhin, P.A., by way of Counterclaim against the Counterclaim-Defendant, Bank of America, N.A. ("BOA"), successor in interest to Merrill Lynch Credit Corporation ("MLCC"), by and through its servicer and attorney-in-fact, PHH Mortgage Corporation, says:

## NATURE OF ACTION

1.     BOA, one of the largest commercial banks in the United States, has acted wrongfully, improperly, including negligently and without regard for the rights and entitlements of its borrower, Kirby, all of which were conferred upon him as a result of a $1.5 million construction loan ("Loan") made to him through MLCC, which upon information and belief, is now BOA's wholly owned and/or controlled subsidiary and/or related and/or affiliated company.

2.     Upon information and belief, by virtue of BOA's succession in interest to MLCC, all references hereinafter to MLCC shall be deemed to include BOA, inasmuch as MLCC's actions and conduct are in accordance with governing law attributable to and binding upon BOA.

3.     The Loan was made in connection with Kirby's renovation and structural improvements to his personal residence ("Residence" and "Project," respectively) located at 210

11

Mercer Street, Princeton, New Jersey ("Property"). The Residence is one of the grand and historically distinguished houses of Princeton Borough, New Jersey, and as such, is a well-known landmark within the municipality and very familiar to and of great interest to its residents.

4.     Specifically, the Counterclaim arises out of the negligent and otherwise improper manner and means by which MLCC inspected and/or failed to inspect the Project as a precondition of its disbursement of the Loan proceeds to Kirby, including the Loan's Administration (said term being defined in the Affirmative Defenses).  Included in such negligent and/or improper actions and conduct by MLCC were its repeated failures to properly review and analyze the extensive documentation provided on Kirby's behalf to MLCC in connection with the disbursement of the Loan proceeds, and in the process, its failure to realize and inform Kirby that the Project could not be timely finished in accordance with its estimated costs and completion date for same as each are more particularly defined and set forth in the Loan Documents.

5.     Following the contemplated disbursement of the entire Loan proceeds and upon the issuance of a certificate of occupancy ("CO") or its equivalent for the Residence, the Loan was to immediately convert to a permanent mortgage ("Permanent Financing").  In connection therewith, MLCC would continue to retain a first mortgage lien upon the Residence, its improvements and the Property (collectively, the "Mortgaged Premises") as was the case in connection with the Project's construction.

6.     At all relevant times hereto, Kirby lacked any experience in and was wholly unfamiliar with construction projects, construction lending and all of the myriad incidents and documentation and other processes and procedures relating thereto.  Similarly, Kirby had no prior experience dealing with design professionals, architects, builders and/or construction

tradesmen or anything remotely resembling, the scope and complexity, of the Project and renovation of the Residence.

7.     As a material inducement for Kirby to agree to the Loan, MLCC through its Agents (said term being defined in the Affirmative Defenses) made repeated representations, assurances and promises (collectively, "Representations") to him that its Agents were charged with the responsibility to administer, oversee, supervise and monitor the Loan, and in particular, assure compliance with and adherence to all Loan provisions and MLCC's practices and procedures as explained to Kirby (collectively, the "Loan Procedures"). The Representations were made so as not to jeopardize the Project's viability, including its timely completion and "on budget" in accordance with its estimated costs to complete.

8.     Included within the Loan Procedures was the requirement that a Construction Loan Draw Request Affidavit (each a "Draw Affidavit" and collectively, the "Draw Affidavits") be submitted to MLCC and/or its Agents for its/their review, reflective, among other things, of the amounts of labor and materials expended during the applicable construction time period, and most importantly, that Project completion was proceeding timely, on schedule, and in line with its anticipated completion date. Following Project completion, the Loan automatically would convert to Permanent Financing.

9.     Additionally, to induce Kirby to enter into the Loan, and in connection with the disbursement of the Loan proceeds, the Loan Procedures included regular periodic site inspections (each an "Inspection" and collectively, "Inspections") of the Project and Residence to be performed by MLCC's Agents. The Representations and in particular, the Loan Procedures with respect to the Inspections and the Draw Affidavits, individually as well as collectively, were intended to assure Kirby that the Project was proceeding timely, on schedule, and towards its

anticipated completion date in accordance with the estimated cost to complete. In other words, MLCC undertook the proverbial "belt and suspenders" approach to win Kirby's trust and his agreement to enter into the Loan.

10.     As a precondition of entering into the Loan, MLCC insisted and required that Kirby invest $1 million of his own monies into the Project, which Kirby did, by personally paying out-of-pocket in excess of $1 million to persons/entities working on the Project.

11.     At all relevant times, including Kirby's determination to invest more than $1 million of his own funds into the Residence as a precondition for MLCC's funding the Loan, Kirby reasonably believed and relied upon the Representations that the Loan Procedures would not only act to safeguard his investment, but also as a means by which to ensure the timely completion of the Project at or under its estimated cost. In short, Kirby never would have invested more than $1 million without being sufficiently assured and promised by MLCC and its Agents that at all times its/their Administration of the Loan would be professionally and responsibly handled so as to not jeopardize his substantial personal investment, as well as the timely and "on budget" completion of the Project.

12.     Despite MLCC's obligations owing to Kirby pursuant to the Loan Documents, and the Representations made to him, MLCC negligently, haphazardly, carelessly and otherwise failed in the Administration of the Loan, including but not limited to, reviewing the Draw Affidavits and conducting the Inspections. Accordingly, MLCC was unaware of the actual true stage and percentage of completion of the Project. Tragically, the Project eventually ground to a complete halt and standstill, with the Residence remaining uninhabitable and the Project site being reduced to a "war zone," forcing Kirby to move his residence to a cottage on the Property located adjacent to the Residence, where he continues to live at this time.

14

13.     However, had MLCC and its Agents discharged its/their duties owing to Kirby and acted in accordance with the Representations, MLCC would and/or should have known each time a Draw Affidavit was submitted, that the Project was grossly underfunded and its anticipated completion date impossible to meet.  In fact, a competent visual inspection of the then ongoing status and condition of the Residence would and/or should have fully informed MLCC and its Agents, and made them aware that the Project's percentage of completion was seriously at variance from that reflected in each Draw Affidavit.

## THE COUNTERCLAIM PARTIES

14.     Kirby is a soon to be seventy-five year old individual and resident of the State of New Jersey, currently residing at 216 Mercer Street, Borough of Princeton, County of Mercer and State of New Jersey.  This residence is a cottage also located on the Property adjacent to the Residence.

15.     Upon information and belief, BOA is a national bank chartered in, and purportedly as a result thereof, domiciled in North Carolina.

16.     Upon information and belief, at all times relevant herein, MLCC was a corporation organized and existing under Delaware law.

17.     Upon information and belief, BOA presently is the successor in interest by merger, acquisition and/or other transaction to MLCC.

18.     Upon information and belief and subject to the completion of Kirby's continuing investigation, Counterclaim-Defendants, John Does Nos. 1-40 (collectively, the "Doe Parties") are presently unknown individuals and/or entities who perpetrated, facilitated, directly participated in and/or aided and abetted the improper conduct and actions more particularly described hereinbelow.  Upon information and belief, the Doe Parties may be liable for all or part

of the damages sustained by Kirby.  Upon identifying them during discovery, Kirby shall amend this pleading to incorporate their true identities.

### FACTS COMMON TO ALL COUNTS

#### A.   The Project And Kirby's Personal Expenditures

19.    At some time prior to June, 2008, Kirby decided to undertake the Project which entailed making substantial structural alterations, additions and modifications to the Residence.

20.    In order to commence the Project, Kirby met with, engaged and retained multiple professionals and contractors, as applicable, to participate in, perform and provide the services, labor and materials necessary to undertake and complete the Project.  Accordingly, on or about December 8, 2006, Kirby hired architect, Stephen Rhoads Architect LLC ("Rhoads"), to perform, among other things, professional design services for the Project.  In addition to his contractual duties and responsibilities as architect, on or about July 11, 2007, Kirby additionally contracted with Rhoads to serve as construction manager for the Project.

21.    Between July 2007 through August 2008, Kirby in connection with the Project paid all of the contractors including Rhoads out of his personal funds (collectively, the "Expenditures") without borrowing monies from MLCC or anyone else.  Indeed, by late summer 2008, upon information and belief, the Expenditures totaled approximately $1,016,585.55.

22.    However, in or about June 2008 it became apparent to Kirby and Rhoads that additional funding in excess of the Expenditures would be needed to complete the Project.

23.    Accordingly, at or about this time, Kirby approached MLCC to inquire about the possibility of obtaining additional funding through a construction loan (i.e., the Loan) which, after full disbursement of its proceeds, would automatically convert to Permanent Financing.

16

24.     As part of securing additional funding for the Project, Kirby and/or Rhoads communicated and supplied MLCC and/or its Agents with detailed information and documents evidencing and setting forth the then status of the Project, including but not limited to, detailed spreadsheets and documentation setting forth the Expenditures to date and also the anticipated going forward amount of monies necessary to complete the Project.

25.     Specifically, included within the documentation given to MLCC, Rhoads provided its Agents with a comprehensive and detailed cost breakdown of the Expenditures, including but not limited to, copies of Kirby's cancelled checks evidencing and bank statements reflective of the exact amounts Kirby had paid to Rhoads and each contractor.

26.     It was also at or about this time that Kirby met with MLCC, which insisted as a precondition of its possibly funding the balance of monies needed to complete the Project, that he personally invest, over and above the Expenditures, additional personal funds exceeding $50,000.00.

### B.     The MLCC Loan Documents

27.     In or about the spring of 2008 and continuing through September 2008, Kirby met with and/or communicated with MLCC to apply for and negotiate the terms and conditions of the Loan. In connection with these meetings and/or discussions, Kirby advised MLCC that the estimated cost of the Improvements was approximately $2.5 million, with approximately $1 million already have been paid by him as evidenced by the Expenditures.

28.     After a complete discussion with MLCC regarding the then status of the Project, MLCC became fully aware and informed of same. Thereupon, Kirby and MLCC entered into the Agreement (said term being defined in the Answer).

29.     Consistent with and corroborating Kirby and Rhoads' discussions with and about disclosures to MLCC, the Agreement in that portion thereof entitled "Article 1 DEFINITION OF TERMS" set forth that the "Construction Costs" or the estimated cost of the Improvements was $2,567,123.00.

30.     Additionally, the following terms were each defined and set forth in the Agreement as follows:

> "Construction Cost Deficiency" means an amount which may be established by LENDER [i.e., MLCC] at any time during the term of the Loan if LENDER determines that the actual cost to complete construction of the Improvements may or will exceed the sum of the Loan Proceeds and the funds representing the Cost Balance, if any.
>
> **"Construction Period" means the period ending 03/31/2010.**
>
> "Cost Balance" means the negative difference, if any, between the Loan Proceeds and the Construction Costs. [Emphasis Added]

31.     In addition to the foregoing, the Agreement also set forth the procedures for the disbursement of the Loan proceeds to Kirby which, in relevant part, provided as follows:

> 2.2     Cost Balance and Construction Cost Deficiency
>
> a.     Any Cost Balance will be funded by Owner before the disbursement of any loan proceeds by LENDER.
>
> * * *
>
> d.     At any time during the term of the Loan, LENDER may determine that the actual cost to complete construction of the Improvements may or will exceed the sum of the Loan Proceeds and the funds representing the Cost Balance, if any. In that event, Owner will fund such excess cost prior to any disbursement or further disbursement being made by LENDER. In the alternative, Owner will, upon demand of LENDER, deliver the amount of such excess cost (the "Construction Cost Deficiency") to LENDER.
>
> e.     LENDER will hold any Cost Balances and any Construction Cost Deficiency for subsequent disbursement. At LENDER's option, the Cost Balance and/or Construction Cost Deficiency may be applied in full to the

18

Construction Costs before disbursement of any Loan Proceeds, or may be applied proportionately with the Loan Proceeds to the Construction Costs.

\* \* \*

h.      Owner agrees that the holding, application and disbursement of any Cost balance and any Construction Cost Deficiency will be for the account of Owner.   However, it is expressly understood by Owner and LENDER that the holding, application and disbursement of the funds is for the protection of LENDER.

\* \* \*

2.4      **Requests for Disbursement**

a.      LENDER will have no obligation to disburse funds unless:

1.  Owner has delivered to LENDER a signed request for disbursement in form and content satisfactory to LENDER.

\* \* \*

4.      **LENDER has conducted such inspections as it may require, and the results of the inspections are satisfactory to LENDER.** [Emphasis Added]

\* \* \*

32.      In addition to the foregoing section entitled "Requests for Disbursement" (inclusive of the Draw Affidavits) and the procedure and manner by which the disbursement of the Loan proceeds were to occur, the Agreement also included an affirmative obligation of MLCC to conduct through its Agents regular, on-site Project related inspections of the Residence.  Specifically, the Agreement provided as follows:

2.5 Inspection Rights and Fees; Correction of Defects

a.      LENDER or its agents will have the right at all times during the period of construction to enter upon the Property to conduct inspections.  LENDER will have the right to inspect all records related to the construction of the Improvements at any reasonable time.

b.     **Scheduled Inspections will be required for each disbursement under the Disbursement Schedule.**

c.     **Owner will pay all costs of LENDER inspections conducted pursuant to this action.   The estimated cost of each inspection is $125.00.   At closing of the Loan, Owner will pay to LENDER the sum of 2,000.00 representing the inspection fees payable for 16 inspections.   If more than 16 inspections of work in progress are required, then prior to each such additional inspection Owner will pay to LENDER the applicable fee for such inspection.   If Owner fails to make such payment, LENDER may disburse to itself such inspection fee out of the Loan Proceeds, the Cost Balance, if any, or any such other funds delivered to LENDER pursuant to the terms of this Agreement.**

d.     LENDER is under no obligation to supervise construction of the Improvements.   LENDER's inspection of the construction of the Improvements is for the sole purpose of protecting and preserving the security of LENDER.     No inspection is the be construed as a representation or endorsement that the construction of the Improvements is in fact in compliance with Plans and Specifications, that the construction will be free of defective material or workmanship, or that the construction is in compliance with limitations or requirements imposed by covenants and restrictions of record or by governmental authority. [Emphasis Added]

33.     In addition to the foregoing provisions, the Agreement also provided in its Article 3 as follows:

3.1     Plans and Specifications

a.     **No change in the Plans and Specifications will be made without the express written approval of LENDER.** [Emphasis Added]

### C.     The MLCC Pre-Closing Documents

34.     In addition to the Agreement, Kirby received either prior to and/or at the closing of the Loan, additional documents which, too, reinforced and corroborated his understanding of the relationship between MLCC and him relating to the Inspections, the Draw Affidavits and MLCC's undertakings with regard to its ensuring the timely and "on budget" completion of the Project.

20

35.     By way of illustration only and not limitation, one of these documents given to Kirby by MLCC entitled "Funding Agreement" ("Funding Agreement") provided in relevant part as follows:

A.     In addition to the terms stated in the Credit Documents, there are certain conditions precedent to the obligation of Lender to fund disbursements under the construction loan agreement, all as more particularly set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties agree as follows:

1.     In addition to those conditions stated in the Loan Agreement, Lender shall not be obligated to release, pay over, or fund any sums under the Credit Documents until such time as the following conditions precedent have each been satisfied by the Borrower.

**(a)     Borrower has demonstrated to Lender reasonable satisfaction that Borrower has expended $50,438.00 in hard costs toward the construction of the Improvements at the Subject Property.  Evidence of said expenditures shall include paid invoices, lien waivers, and similar documentation satisfactory to Lender in amount and content.**

**(b)     A satisfactory inspection of the Improvements is made by Lender.   Without limiting the generality of the foregoing, the inspection shall reveal that construction in all material respects is complete in the approximate percentage represented by the amount of construction costs paid by Borrower in relation to the total costs to construct the Improvements as set forth in the construction contract between Borrower and Madar Construction, dated .**

(c)     Borrower shall satisfactorily demonstrate to Lender that, except with the prior written consent of Lender, there have not been nor are there any pending change orders.

* * *

(e)     Borrower has performed and construction has proceeded in accordance with the terms of the Loan Agreement and no default exists under any of the Credit Documents. [Emphasis Added]

21

36.     In addition to the Funding Agreement, MLCC also provided Kirby with a document entitled "Supporting Documentation Requirements" ("Supporting Documentation") which, in relevant part, provided as follows:

> **First Disbursement**
>
> * * *
>
> 8.     **Satisfactory inspection to be performed by Merrill Lynch Credit Corporation confirming that completed work supports the loan advance requested.**
> * * *
>
> **Interim Disbursements**
>
> 1. Draw Request Affidavit
>
> 2. **Satisfactory inspection to be performed by Merrill Lynch Credit Corporation confirming that completed work supports the loan advances requested.**
>
> * * *
>
> **Final Disbursement and Conversion to Permanent Mortgage**
>
> 1. Draw Request Affidavit [Emphasis Added In Part]
>
> * * *

37.     In addition to the Funding Agreement and Supporting Documentation, on or about June 30, 2008, MLCC by memo of even date therewith ("June 2008 Memo"), further informed Kirby with respect to anticipated Loan related disbursements as follows:

> Dear Builder: [i.e., Kirby]
>
> * * *
>
> During the construction phase we will make disbursements based on work that is complete and in place.  The customer will receive Draw Request Affidavits at closing.  An affidavit must be completed and faxed to our office to initiate each construction disbursement.  A local inspector will

inspect the property and report back to us. The disbursement will be according to the inspector's report on progress.

Prior to closing a Draw Specialist will be assigned to this loan. They will be your point of contact throughout the construction. The Construction Loan Processor will notify you of the Draw Specialist assigned to this Loan prior to closing.

38.     Moreover, MLCC, in another pre-closing document entitled "Borrower Construction Financing Loan Information" ("Construction Financing Information"), informed Kirby regarding how and when Loan disbursements would occur, as well as his obligation for any "cost balance" (as said term is more particularly defined therein), which upon information and belief, was tantamount to the term "Construction Deficiency" (as said term is more particularly defined in the Agreement), as follows:

* * *

**During the construction phase, the loan proceeds will be disbursed based upon satisfactory verification of work completed**. Construction draws are usually made payable to you or jointly to you and your Builder/Contractor. You will be responsible for monthly payments based on the amount disbursed.

You shall be responsible for funding the difference, if any, between the net loan proceeds and total construction cost (the "Cost Balance"). The Cost Balance shall be deposited or paid to Merrill Lynch Credit Corporation at the time of closing or prior to the initial disbursement. [Emphasis Added]

39.     The Funding Agreement, Supporting Documentation, June 2008 Memo and Construction Financing Information (each of which individually and collectively shall, for purposes of term as used hereinbelow, be deemed to constitute a part of the "Loan Documents").

**D.    MLCC's Complete Disregard Of The Agreement's
Provisions And Its Obligations Thereunder**

40.    On or about September 15, 2008, Kirby signed the Agreement (a partial copy of which is attached to the Complaint as **Exhibit A** and which is incomplete as the Disbursement Schedule identified as **Exhibit B** to the Agreement is missing).

41.    Upon information and belief, more or less contemporaneously with Kirby's execution of the Agreement, he, as mortgagor, also executed and provided to MLCC, as mortgagee, a first lien mortgage ("Mortgage") upon the Mortgaged Premises.  On or about the same date, Kirby also executed and provided to MLCC an Adjustable Rate Promissory Note and Rider thereto (collectively, the "Note") evidencing the Loan.

42.    The Note, among other things, provided that only interest at a prescribed rate was to be paid by Kirby until April 1, 2010, at which time the conversion to Permanent Financing governed by different financing terms would take effect.  The Note provided that commencing May 1, 2010, the applicable interest rate would be reset and adjusted, as applicable, with Kirby still having to pay interest only without any payments to be made towards principal reduction for a period of ten (10) years or until March 31, 2020.  Commencing on May 1, 2020, the Note, further provided that principal and interest payments, together with other applicable charges, were to be thereafter due on a monthly basis until on April 1, 2035; at which time, the Note would mature with all then due and owing amounts remaining thereunder becoming payable in full.

43.    Additionally, at or about the time that Kirby executed the Loan Documents, including, among other instruments, the Agreement, Mortgage and Note, he also was asked and directed by MLCC to: (i) date the face page of that blank Draw Affidavit by inserting the date of "September 15 2008" (i.e., the date appearing on the Agreement, Mortgage and Note); (ii) affix

24

his signature upon same; and (iii) have his signature acknowledged by a notary public. Upon information and belief, except in a very few or possibly only a single instance, the Draw Affidavits which were submitted to MLCC as a precondition for the disbursement of a portion of the Loan proceeds, included the inaccurate September 15, 2008 date which MLCC had directed Kirby to affix onto the blank Draw Affidavit, as well as a photocopy of his signature, as well as the notarial acknowledgment thereof.

44.     Upon information and belief, throughout the entire period during which MLCC received each of the Draw Affidavits and partially disbursed the Loan Proceeds to Kirby, it relied upon and never questioned or raised any issue either with Kirby, Rhoads or anyone else acting on Kirby's behalf, concerning either the date discrepancies appearing on the face page of the Draw Affidavits and elsewhere thereon, or the fact that each of the Draw Affidavits had been submitted based on the photocopied signature and acknowledgment of Kirby and the notary public, as applicable.

45.     At the closing of the Loan and purportedly in accordance with Section 2.5b of the Agreement, MLCC required Kirby to pay the sum of $2,000.00 representing the estimated cost of sixteen (16) separate Inspections (collectively, the "Inspection Fees").

46.     Both at the times Kirby discussed, negotiated and ultimately executed the Loan Documents he was assured, promised and lead to believe by MLCC and its Agents, and consequently understood, that the Draw Affidavits and Inspections were material, instrumental and integral provisions of the Loan Documents, and he reasonably relied upon such understanding as memorialized in the Loan Documents and evidenced by the Representations.

47.     At all relevant times, Kirby, based upon the Representations, understood and was led to believe by MLCC that he and MLCC collectively shared and were proceeding upon a

mutual and common interest not only in completing the Project timely with an anticipated completion date of March 31, 2010 (the defined "Construction Period" under Article 1 of the Agreement), but also at an estimated cost of $2,568,123.00 (which amount represented the defined "Construction Costs" also established under the Article 1 of the Agreement).  Thus, it was not only of paramount and overriding importance to Kirby in entering into the Loan Documents, but his understanding and expectation, as well, that as a result of MLCC's Administration of the Loan, there would be strict compliance with the "Construction Period" deadline of March 31, 2010 and the "Construction Costs" of $2,568,123.00.

48.   Consistent with Kirby's understanding, the Agreement is replete with provisions evidencing the joint, common and aligned interests of borrower and lender in connection with the requirement for timely and "on budget" Project completion.

49.   By way of illustration only and not limitation, the following provisions of the Agreement evidence and confirm Kirby and MLCC's common and aligned interest under the Loan Documents in assuring the timely and "on budget" completion of the Project.

> **3.1a.   No change in the Plans and Specifications [for the Project] will be made without the express written approval of LENDER [i.e., MLCC]**
>
> * * *
>
> 3.3   Selection of Contractor
>
> **c.   Owner will disclose to LENDER on a current and ongoing basis, the names of all persons with whom Owner has contracted or intends to contract for the construction of the Improvements or for the furnishing of labor, materials or services thereafter.   When required by LENDER, Owner will obtain the consent of LENDER to the engagement of all such persons.** LENDER's waiver and acceptance of any such person or parties is intended for the protection of LENDER's security, and is not for enforcement of workmanship or financial condition of any such person or party.

    3.4    Assignment of Construction Contract/Subordination of Vendor's Lien

    **a.    The Owner hereby assigns to LENDER all of the Owner's right, title and interest in and to the Construction Contract and all permits, Plans and Specifications.** [Emphasis Added]

50.    Although Section 2.5d of the Agreement provides, in part, that "Lender is under no obligation to supervise construction of the Improvements" it was clear, understood and apparent to Kirby that MLCC's role in the Project far transcended merely lending and disbursing the Loan proceeds to him. This conclusion was corroborated by, among other things, the Agreement's prohibition in Section 3.1a regarding any change in the Project's Plans and Specifications being undertaken without Kirby's first securing MLCC's express or written approval of same.

51.    Similarly, Kirby's unqualified assignment pursuant to MLCC of all of his right, title and interest in the Construction Contract and all of the Project's permits, Plans and Specifications, further evidence MLCC's shared control, oversight and monitoring responsibility of the Project, including but not limited to, its timely and "on budget" completion.

52.    Moreover, the Agreement's provisions relating to the Inspections, independently as well as collectively with the Representations, convinced Kirby that MLCC and its Agents were expected to and would take appropriate affirmative action, including intervening when needed in order to assure the timely and "on-budget" completion of the Project; all of which Kirby reasonably and in good faith relied upon in entering into the Loan in the first instance.

53.    For illustrative purposes only, Sections 2.4a and c, respectively, of the Agreement exemplify the critical role, oversight and supervisory and monitoring functions MLCC assumed and was expected to discharge *vis a vis* the Project. Under the foregoing provisions, MLCC, alone and in the exercise of its sole discretion, retained control over the disbursements of the

Loan proceeds until such time as "Lender has conducted such inspections [of the Project] as it may require, and the results of the inspections are satisfactory to it." [Section 2.4a.4]  Further, in accordance with the Agreement's Section 2.5b, **"[s]cheduled inspections will be required for each disbursement under the Disbursement Schedule."** [Emphasis Added]

### E.   The Sham Of The Inspections And MLCC's Flagrant Disregard Thereof

54.    As seen from the foregoing, the Agreement's provisions regarding the periodic Inspections was a material element in Kirby's decision and willingness to execute the Loan and borrow from MLCC, as opposed to seeking out such financing through other possible construction/permanent lenders.

55.    At all relevant times hereto, MLCC despite the importance of the Inspections mechanism, by its actions, inactions and/or conduct upon receipt of each of the Draw Affidavits and its Agents' completion of the Inspections, grossly disregarded and materially breached the Agreement, thereby depriving Kirby of the benefit of his contractual bargain with MLCC.

56.    Despite paying the Inspections Fees in a lump sum at the closing of the Loan for the approximate sixteen (16) anticipated separate Inspections, Kirby was never provided with a single copy of any Inspection report, despite having repeatedly asked MLCC for same.

57.    Additionally, upon information and belief, those persons/entities designated and selected by MLCC as its Agents to conduct the Inspections had no continuity as multiple different "inspectors" randomly and irregularly appeared at the Project for such purpose. Accordingly, upon information and belief, there never was one single individual charged with conducting the Inspections and who as a result of prior Inspections had any real and meaningful understanding and historical prospective of the pace of the Project, how it was or was not then proceeding, and whether its anticipated completion date of March 31, 2010 remained feasible

and achievable based upon the Residence's then state of percentage of completion, and additionally, had any sense of the remaining costs to complete the Project.

58.     As a result of the lack of continuity in the Agents who randomly visited and inspected the Project, MLCC was wholly unaware, remained in the dark, and consciously or unconsciously, turned a "blind eye" toward the disruptions and delays which had so impaired and delayed the Project's timely and on-budget completion.

59.     Had MLCC complied with and discharged its Inspection obligations and duties under the Loan Documents, it easily and quickly would have realized that the Project's anticipated completion date, and its then stage of completion and budget, each were in severe trouble and certainly, not "on track."

60.     Moreover, had MLCC undertaken a careful review and analysis of each of the Draw Affidavits prior to making partial disbursements of the Loan Proceeds, it also would have and/or should have realized that the percentage of completion of the Project, as measured against the anticipated completion date and construction costs expended to the dates of each of the Draw Affidavits, could never have been complied with or met, and consequently, there would be no compliance with applicable provisions of the Loan Documents.

61.     In short, had MLCC undertaken even the most cursory review and analysis of the Draw Affidavits, it would have been readily and immediately apparent that it needed to immediately meet with Kirby and/or Rhoads (and/or any other relevant contractor) in order to understand exactly what was happening with the Project and the reasons why the percentage of completion continued to vary so greatly from that originally contemplated by the Agreement. In sum, MLCC reduced the requirement for the submission of the Draw Affidavits and its

Inspections to mere *pro forma* formalities, with each having no meaningful purpose or function

at all in assuring timely and on budget Project completion.

62.    Not only did MLCC wholly disregard and effectively reduce to mere surplusage

the Draw Affidavits and Inspections requirements and its obligations under the Loan Documents,

it also similarly flagrantly disregarded the applicable provision contained therein relating to any

"Construction Cost Deficiency," as said term is defined in Article 1 and specifically Section 2.2

of the Agreement.

63.    Section 2.2d of the Agreement provided as follows:

> e.  At any time during the term of the Loan, LENDER may determine that
> the actual cost to complete construction of the Improvements may or
> will exceed the sum of the Loan Proceeds and the funds representing
> the Cost Balance, if any.  In that event, Owner will fund such excess
> cost prior to any disbursement or further disbursement being made by
> LENDER.  In the alternative, Owner will, upon demand of LENDER,
> deliver the amount of such excess cost (the "Construction Cost
> Deficiency") to LENDER.

64.    On September 23, 2011, Kirby suffered five (5) separate cerebrovascular strokes

as well as a major heart attack (collectively, the "Illness"), all of which serious conditions

required his hospitalization in four (4) hospitals over a period of three (3) months.

65.    It was only while Kirby was hospitalized and disabled as a result of his Illness

that MLCC, for the first time since the Loan Documents had been executed on September 15,

2008, and then only in response to inquiries made on Kirby's behalf while he was hospitalized,

disclose and advise that additional monies would have to be advanced by Kirby prior to any

further partial disbursements being made by MLCC of the then remaining Loan proceeds.

66.    Presumably, the foregoing advice conveyed by MLCC and its sudden, "out of the

blue" insistence that there be compliance with applicable provisions of the Agreement

(notwithstanding its longstanding wholesale and flagrant disregard of same) represented the

x:\individual\weinberger, kirby\216 mercer street, princeton - bank of america foreclosure action\answer 2-6-13_-3_clean.doc

purported activation and exercise by MLCC of Section 2.2d of the Agreement regarding a then obvious "Construction Cost Deficiency."

67.     Had MLCC properly and competently conducted the Inspections, and had an informed and knowledgeable Agent having some continuity with prior Inspections carefully reviewed and analyzed the multiple Draw Affidavits, MLCC would and/or should have informed Kirby that the stage or percentage of the Project's completion and estimated construction costs were not only significantly unachievable but that steps needed to be immediately taken to rectify the situation.

68.     At all relevant times, Kirby complied with his payment and other obligations under the Loan Documents, including but not limited to, the Note and never missed an interest payment under the Loan.

69.     Notwithstanding the foregoing, MLCC, despite Kirby's repeated requests, refused to disburse the remaining balance of the Loan proceeds totaling approximately $266,000.00 as it was required to do under the Agreement.  Further, by letter dated May 21, 2012, MLCC gave Kirby notice of his purported default under the Loan Documents, and accordingly, advised that unless full payment of the then outstanding Note balance, inclusive of outstanding principal, was not paid in accordance therewith, it intended to foreclose the Mortgage.

70.     As a direct and proximate result of the foregoing, including MLCC's Administration of the Loan and its actions, inactions and/or conduct, the Project ground to a halt with no further construction of any kind being performed.  Consequently, at the present time the Project lies dormant with the Residence in shambles, having been reduced to a "white elephant," all to Kirby's great damage and detriment.

31

## FIRST COUNT

### (Breach of Loan Documents)

71.     Kirby repeats and realleges each of the allegations contained in paragraphs 1-70, inclusive, as if set forth verbatim and at length herein.

72.     By way of illustration only and not limitation, MLCC materially breached the Loan Documents, including the Agreement, by its actions, inactions and/or conduct in the following ways:

  a.     Failing to conduct and perform the Inspections in a proper and appropriate manner under the Agreement and concealing such failures from Kirby;

  b.     Failing to timely inform Kirby of and concealing from him the results of each of the Inspections and denying him receipt of copies of the Inspections reports;

  c.     With respect to each Draw Affidavit, failing to properly and appropriately review and analyze the information, including but not limited to, construction and all other costs incurred on the Project, and the then applicable percentage of completion of the Project as same was set forth and reflected therein, and concealing all of the foregoing failures from Kirby;

  d.     Failing to timely inform Kirby and concealing from him the results of its review and analysis of each of the Draw Affidavits, assuming *arguendo,* that same was ever undertaken;

  e.     Failing to properly disburse to and withholding the balance of the Loan proceeds from Kirby for no lawful reason and in breach of the applicable provisions of the Loan Documents, including the Agreement;

  f.     Failing to timely notify Kirby and concealing from him at all times prior to the Illness, that there was a Construction Cost Deficiency under the Loan Documents, including the Agreement; and

  g.     Insisting and requiring Kirby to invest in excess of $1,050,000.00 million at the inception of the Project as a precondition to the Agreement, and thereafter, further requiring him to invest an approximate $50,000.00 in additional funds prior to the first partial disbursement of the Loan proceeds.

73.     Upon information and belief, MLCC's failure to comply with its obligations under the Loan Documents is, among other unlawful and improper purposes, an attempt by

MLCC to protect itself from a downturn in the economy, and arrange for the creation of a non-material and "technical" default under the Loan Documents, in a blatant and pre-textual attempt to accelerate the Loan and institute the within foreclosure proceeding and seize control, possession and ownership of the Residence.

74.     MLCC's material breaches of the Loan Documents, including the Agreement, and its decision to improperly withhold the balance of the Loan proceeds and to not disburse same to Kirby, is the proximate cause of the purported technical default of Kirby, if any, under the Loan Documents.

75.     As a direct and proximate result of the actions, inactions and/or conduct of MLCC, Kirby has been caused to suffer and in the future will continue to suffer financial loss, damage and irreparable harm.

## SECOND COUNT

### (Breach of Implied Duties of Good Faith and Fair Dealing)

76.     Kirby repeats and realleges each of the allegations contained in paragraphs 1-75, inclusive, as if set forth verbatim and at length herein.

77.     By its foregoing actions, inactions and/or conduct, MLCC has breached the implied duties of good faith and fair dealing which it at all times owed Kirby in connection with the negotiation, execution, and thereafter, the effectuation of the Loan Documents.

78.     As a direct and proximate result of the actions, inactions and/or conduct of MLCC, Kirby has been caused to suffer and in the future will continue to suffer financial loss, damage and irreparable harm.

### THIRD COUNT

### (Negligence)

79.     Kirby repeats and realleges each of the allegations contained in paragraphs 1-78, inclusive, as if set forth verbatim and at length herein.

80.     At all relevant times, MLCC was under a duty of care to Kirby to act reasonably in connection with the Loan and Loan Documents, including but not limited to, the Loan's Administration.

81.     By its action, inactions and/or conduct, MLCC knowingly, recklessly, intentionally and/or willfully breached its duties owing to Kirby and was thereby negligent, or alternatively grossly negligent, in connection with the Project and the Loan's Administration.

82.     As a direct and proximate result of the actions, inactions and/or conduct of MLCC, Kirby has been caused to suffer and in the future will continue to suffer financial loss, damage and irreparable harm.

### FOURTH COUNT

### (Reformation)

83.     Kirby repeats and realleges each of the allegations contained in paragraphs 1-82, inclusive, as if set forth verbatim and at length herein.

84.     At all relevant times, including but not limited to, prior to the execution of the Loan Documents, and continuing thereafter, both Kirby and MLCC anticipated, expected and proceeded with the Project in reliance upon their mutual reasonable assumption, expectation, promise and understanding (collectively, the "Understandings") that the Construction Costs to complete the Project as set forth in Article 1 of the Agreement was $2,567,123.00.  The Understandings represented the basis upon which Kirby entered into the Loan and executed the

34

Loan Documents and MLCC, in turn, agreed to lend $1.5 million in construction financing to ultimately be converted to Permanent Financing.

85.     Notwithstanding and despite the foregoing common understandings and underlying assumptions and premises upon which Kirby and MLCC at all times proceeded, there was a material mutual mistake of fact in that the Construction Costs were grossly underestimated and fell substantially short of the actual amount of monies needed to complete the Project. Although MLCC knew or should have known of same by virtue of the Inspections and its receipt and review of the Draw Affidavits, it intentionally and knowingly, or alternatively, negligently or otherwise decided not to and failed to apprise Kirby of such material mutual mistake of fact at any time prior to the Illness.

86.     As a result of the parties' material mutual mistake of fact, the Loan Documents should, by law and in equity be reformed to reflect the mistaken underfunding of the Project, and BOA, be ordered to: (i) immediately disburse the balance of the Loan Proceeds to Kirby; (ii) provide additional monies in an amount to be determined so as to enable Kirby to complete the Project; (iii) convert the Loan to Permanent Financing in the principal amount of the Loan plus the additional financing to be determined to complete the Project; (iv) rescind its "Notice Of Intention To Accelerate And Foreclose" ("Foreclosure Notice") as set forth in the May 21, 2012 letter, a copy of which is attached as **Exhibit D** to the Complaint; and (v) forbear, until further order of this Court, from any continuing efforts to foreclose the Mortgage.

87.     As a direct and proximate result of the actions, inactions and/or conduct of MLCC, Kirby has been caused to suffer and in the future will continue to suffer financial loss, damage and irreparable harm.

## FIFTH COUNT

### (Conversion and Misappropriation)

88.     Kirby repeats and realleges each of the allegations contained in paragraphs 1-87, inclusive, as if set forth verbatim and at length herein.

89.     The actions, inactions and/or conduct of MLCC in withholding and failing to disburse to Kirby the balance of the Loan Proceeds constitutes the unlawful conversion and misappropriation of monies to which he is entitled, paid good and valuable consideration for and was and remains his property.

90.     As a direct and proximate result of the actions, inactions and/or conduct of MLCC, Kirby has been caused to suffer and in the future will continue to suffer financial loss, damage and irreparable harm.

## SIXTH COUNT

### (Waste And Impairment And Diminished Value of the Residence)

91.     Kirby repeats and realleges each of the allegations contained in paragraphs 1-90, inclusive, as if set forth verbatim and at length herein.

92.     As a direct and proximate result of the actions, inactions and/or conduct of MLCC, the value of the Residence has been reduced, if not completely impaired and greatly diminished in value.  The actions, inactions and/or conduct of MLCC, in the manner in which it undertook the Loan's Administration and/or the Loan constitute waste, has irreparably damaged the fair market value of the Residence, and has deprived Kirby of all of his right, title and interest therein, as the Residence has been rendered and to date remains uninhabitable and in a state of great disrepair.  Unless MLCC's actions are discontinued, the foregoing state of affairs will continue unabated.

36

93.     As a direct and proximate result of the actions, inactions and/or conduct of
MLCC, Kirby has been caused to suffer and in the future will continue to suffer financial loss,
damage and irreparable harm.

### SEVENTH COUNT

### (Unjust Enrichment)

94.     Kirby repeats and realleges each of the allegations contained in paragraphs 1-93,
inclusive, as if set forth verbatim and at length herein.

95.     As a direct and primate result of the actions, inactions and/or conduct of MLCC,
including but not limited to, the receipt of monies from Kirby on account of Inspection fees,
interest, charges, costs incidental to the Loan and other good and valuable consideration paid by
MLCC, it has been unjustly enriched at the expense of Kirby and to his detriment.

96.     As a direct and proximate result of the actions, inactions and/or conduct of
MLCC, Kirby has been caused to suffer and in the future will continue to suffer financial loss,
damage and irreparable harm.

### EIGHTH COUNT

### (Malicious And Tortious Interference With Prospective Economic Advantage)

97.     Kirby repeats and realleges each of the allegations contained in paragraphs 1-96,
inclusive, as if set forth verbatim and at length herein.

98.     The interference by MLCC with Kirby's rights, entitlements and benefits under
the Loan Documents, including the Agreement, was knowing and malicious and was motivated
solely for the purpose of intentionally and tortiously depriving Kirby of his justifiable and
reasonable expectations of realizing same thereunder, including but not limited to, the timely and

"on budget" completion of the Project as had been described by MLCC to Kirby through the Representations and memorialized in the Loan Documents.

99.    Kirby has been directly and proximately, substantially, economically and financially injured as a result of the malicious and tortious interference by MLCC with his rights, entitlements and interest in and under the Loan and the Residence.

100.    As a direct and proximate result of the actions, inactions and/or conduct of MLCC, Kirby has been caused to suffer and in the future will continue to suffer financial loss, damage and irreparable harm.

### NINTH COUNT

### (Negligent Misrepresentation)

101.    Kirby repeats and realleges each of the allegations contained in paragraphs 1-100, inclusive, as if set forth verbatim and at length herein.

102.    The false, inaccurate and/or misleading Representations of material fact made in connection with Kirby's negotiation of, and thereafter his execution of and performance under the Loan Documents, including the Agreement, were made negligently by MLCC.

103.    Kirby reasonably and in good faith relied upon the materially false and misleading Representations and other non-disclosures and/or omissions of material fact made by MLCC and its Agents in connection with the negotiation and execution of the Loan Documents, and thereafter, his performance thereunder.

104.    MLCC and its Agents knew or should have known of these materially false and misleading Representations made to Kirby and as to which they never intended or were unable to comply with, and also of the foregoing non-disclosures and/or omissions, as all of same were

subsequently confirmed and evidenced by MLCC's complete disregard of its obligations owing to Kirby under the Loan Documents.

105.   Had MLCC and its Agents revealed and disclosed to Kirby their unwillingness and/or true intent to never perform and discharge their duties and obligations owing to him under the Loan Documents, Kirby never would have agreed to the Loan, borrowed and used the Loan proceeds or assumed the risk in connection therewith that the Mortgage would ever be foreclosed upon by MLCC.

106.   Alternatively, the Representations made by MLCC and its Agents were made recklessly.

107.   As a direct and proximate result of the actions, inactions and/or conduct of MLCC and its Agents, Kirby has been caused to suffer and in the future will continue to suffer financial loss, damage and irreparable harm.

## **TENTH COUNT**

### **(Specific Performance)**

108.   Kirby repeats and realleges each of the allegations contained in paragraphs 1-107, inclusive, as if set forth verbatim and at length herein.

109.   As a direct and proximate result of the Representations and the terms and conditions of the Loan Documents, including the actions, inactions and/or conduct of MLCC and its Agents and Kirby's reasonable and good faith reliance thereon, MLCC is estopped from refusing to immediately disburse the remaining balance of the Loan Proceeds in accordance with the Loan Documents, enforcing the Foreclosure Notice and continuing this action.

110.   In the event that BOA and/or MLCC is not directed to specifically perform in accordance with the Loan Documents, Kirby will not realize the benefit of his bargain under the

Loan Documents and will have lost all monies, interest and other good and valuable consideration paid by him to MLCC under the Loan Documents.

111.   As a direct and proximate result of the actions, inactions and/or conduct of MLCC, Kirby has been caused to suffer and in the future will continue to suffer financial loss, damage and irreparable harm.

### ELEVENTH COUNT

**(Imposition of Constructive Trust, Equitable Recoupment,
Disgorgement And An Accounting)**

112.   Kirby repeats and realleges each of the allegations contained in paragraphs 1-111, inclusive, as if set forth verbatim and at length herein.

113.   Due to the actions, inaction and conduct of MLCC, it would be unjust and inequitable to permit BOA to possess, retain, use, profit and/or benefit in any way from the unlawful use, misappropriation and conversion of the monies Kirby has paid under the Loan Documents, or profit in any way from the impairment and diminished value of the Residence.

114.   On account of the actions, inactions and conduct of MLCC, in addition to any other damages for which BOA is liable to Kirby, it should be ordered to forfeit and return to Kirby by way of equitable recoupment and disgorgement, all monies, interest and other good and valuable consideration which it has actually received from Kirby, anticipates receiving from him hereafter or as a result of any sale of the Residence.

115.   As a direct and proximate result of the actions, inactions and/or conduct of MLCC, Kirby has been caused to suffer and in the future will continue to suffer financial loss, damage and irreparable harm.

n:\individuals\smith\rein_kirby\216 mercer street, princeton - bank of america foreclosure action\answer 2-6-13_v.3_clean.doc

## TWELFTH COUNT

### (*Respondeat Superior*)

116.    Kirby repeats and realleges each of the allegations contained in paragraphs 1-115, inclusive, as if set forth verbatim and at length herein.

117.    At all times relevant hereto, upon information and belief, MLCC retained and engaged the Agents who were authorized and designated by it to perform the Inspections under the Loan Documents.

118.    As a direct and proximate result of the foregoing relationship between MLCC and the Agents, MLCC is liable for the actions, inactions and/or conduct of the Agents under the doctrine of *respondeat superior*.

119.    As a direct and proximate result of the actions, inactions and/or conduct of MLCC, Kirby has been caused to suffer and in the future will continue to suffer financial loss, damage and irreparable harm.

## THIRTEENTH COUNT

### (Declaratory Relief)

120.    Kirby repeats and realleges each of the allegations contained in paragraphs 1-119, inclusive, as if set forth verbatim and at length herein.

121.    An actual and justiciable controversy has arisen and now exists between the parties concerning their respective rights and entitlements under the Loan Documents, including the obligation, which BOA denies, to disburse the balance of the remaining Loan proceeds to Kirby.

122.    Kirby seeks a judicial determination of his rights, obligations and entitlements arising under the Loan Documents, including but not limited to, his immediate entitlement to the

balance of the Loan proceeds and conversion of the Loan to Permanent Financing. Such a declaration is necessary and appropriate at this time because BOA has refused to honor its obligations to Kirby under the Loan Documents.

WHEREFORE, Kirby demands judgment against BOA and MLCC, jointly and severally, on the First through Thirteenth Counts, inclusive, as follows:

(a)     Declaring that  BOA and MLCC are equitably estopped from asserting that Kirby is in breach and has defaulted under the Loan Documents, and accordingly, from proceeding with the within action;

(b)     Declaring that Kirby is not in breach of and has not defaulted under the Loan Documents, and accordingly, is entitled to receive all rights, entitlements and benefits thereunder;

(c)     Rescinding the Foreclosure Notice;

(d)     Temporarily and permanently enjoining the continued prosecution of the within action;

(e)     Refund of all monies paid to BOA and/or MLCC by Kirby under the Loan Documents, together with accrued interest from the execution date of the Loan Documents;

(f)     Recoupment and disgorgement of all monies, interest and other good and valuable consideration realized and/or received by BOA and/or MLCC from Kirby in connection with the Loan;

(g)     The immediate, unconditional disbursement to Kirby of the remaining balance of the Loan proceeds;

(h)     The reformation of the Loan Documents to reflect an increase in the amount of financing to be determined for the Project and conversion of the Loan Documents to Permanent Financing and as so modified, the disbursement of said additional funding to Kirby;

(i)     An accounting of all monies, interest and other good and valuable consideration paid by Kirby to BOA and/or MLCC under the Loan Documents;

(j)     Compensatory damages;

(k)     Consequential damages;

(l)     Punitive damages;

(m)   Prejudgment interest;

(n)   Attorneys' fees; and

(o)   All other legal and equitable relief that this Court may deem just and proper.

GRUHIN & GRUHIN, P.A.

155 Prospect Avenue,
Suite 100
West Orange, New Jersey 07052
Telephone: (973) 325-7000

By:/s/ Paul J. Linker
    PAUL J. LINKER (PL8642)
    plinker@gruhinlaw.com

    Attorneys for Defendant-Counterclaimant,
    Kirby Westheimer

Dated: February 15, 2013

## CERTIFICATION

Pursuant to L. Civ. R. 11.2, I hereby certify that the matter in controversy is not the subject matter of any other action or arbitration or administrative proceeding, now or contemplated.

GRUHIN & GRUHIN, P.A.
155 Prospect Avenue,
Suite 100
West Orange, New Jersey 07052
Telephone: (973) 325-7000

By:/s/ Paul J. Linker
    PAUL J. LINKER (PL8642)
    plinker@gruhinlaw.com

    Attorneys for Defendant-Counterclaimant,
    Kirby Westheimer

Dated: February 15, 2013

43